IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE STATE OF ALABAMA, *et al.*,

Plaintiffs,

v.

NATIONSTAR MORTGAGE LLC, D/B/A MR. COOPER,

Defendant.

Civil Action No. 1:20-cv-3551

**CONSENT JUDGMENT**

WHEREAS, Plaintiffs, the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia, and the District of Columbia (collectively, the "Attorneys General" or "Plaintiff States") filed their Complaint on December 7, 2020, alleging that Nationstar Mortgage LLC, d/b/a Mr. Cooper ("Nationstar," "Defendant," or "Servicer") either itself or through its affiliates or subsidiaries violated, among other laws, the consumer protection laws of the Plaintiff States, including unfair and deceptive acts and practices laws, and the Consumer Financial Protection Act of 2010;

WHEREAS, the Attorneys General and Defendant (collectively, the "Parties") have agreed to resolve their claims without the need for litigation by entering into this Consent Judgment and attached Exhibits A (Servicing Standards), B (Distribution of Borrower Payment Amount), C (Release), and D (Instructions for Attorney's Fees and Costs) (collectively, the "Consent Judgment");

WHEREAS, the Parties enter into this Consent Judgment with the understanding that the State Mortgage Regulators have contemporaneously entered into a Settlement Agreement and Consent Order with Nationstar (the "State Mortgage Regulators' Consent Order") in coordination with this Consent Judgment in order to resolve findings identified in the course of the Multi-State Examinations of Defendant;

WHEREAS, the Parties enter into this Consent Judgment with the understanding that the Consumer Financial Protection Bureau ("CFPB") has also entered into a Stipulated Final Judgment and Order with Nationstar (the "CFPB Consent Judgment");

WHEREAS, Defendant, by its attorneys, has consented to entry of this Consent Judgment without trial or adjudication of any issue of fact or law and to waive any appeal if the Consent Judgment is entered as submitted by the Parties;

WHEREAS, Defendant, by entering into this Consent Judgment, does not admit any allegations of wrongdoing or violations of applicable laws, regulations, or rules governing the conduct and operation of its servicing business or with respect to any persons identified for redress or remediation in connection with this Consent Judgment, other than those facts of the Complaint deemed necessary to the jurisdiction of this Court;

WHEREAS, the intention of the Attorneys General in effecting this settlement is to remediate harms allegedly resulting from the unlawful conduct of the Defendant, either undertaken on its own or through its affiliates or subsidiaries;

AND WHEREAS, Defendant has agreed to waive service of the Complaint and Summons and hereby acknowledges the same;

NOW THEREFORE, without trial or adjudication of issues of fact or law, without this Consent Judgment constituting evidence against Defendant except as otherwise noted, and upon consent of Defendant, the Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is therefore ORDERED, ADJUDGED, AND DECREED:

## I. JURISDICTION

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. §§ 5552 and 5565, and personal jurisdiction over Defendant. The Complaint states a claim upon which relief may be granted against Defendant. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 12 U.S.C. § 5564(f).

## II. SERVICING STANDARDS

2. Defendant shall comply with the Servicing Standards, attached as Exhibit A, in accordance with their terms.

3. Defendant shall implement the Servicing Standards no later than January 1, 2021 (the "Implementation Date"). The Servicing Standards attached as Exhibit A shall remain in full force and effect for three years from the Implementation Date. Defendant's obligations to comply with the Servicing Standards shall expire on the date three years after the Implementation Date.

## III. EXECUTIVE COMMITTEE

4. An executive committee comprised of representatives of the government signatories to this Consent Judgment and representatives of the government signatories to the State Mortgage Regulators' Consent Order (the "Executive Committee") has been formed prior to the execution of this Consent Judgment. The Executive Committee shall serve as the representative of the Plaintiff States in the administration of this Consent Judgment. The initial member states of the Executive Committee are: the State Attorneys General of Arizona, California, Colorado, Connecticut, Florida, Illinois, Iowa, Nevada, North Carolina, Ohio, Oregon, Texas, and Washington; and the State Mortgage Regulators of Arkansas, Maryland, Massachusetts, New Hampshire, Texas, and Washington. The Executive Committee may substitute representation, as necessary.

## IV. FINANCIAL TERMS

**Total Settlement Amount**

5. Defendant has paid or provided (or agreed to pay or provide) consumer remediation in a collective amount of $86,346,353, which shall be known as the "Total Settlement Amount," and is comprised of: (i) a Direct Payment Amount to be paid to the Attorneys General; (ii) payments required under the State Mortgage Regulators' Consent Order and the CFPB Consent Judgment; and (iii) remediation provided to borrowers prior to the entry of this Consent Judgment.

**Direct Payment Amount to the Attorneys General**

6. Defendant shall pay $10,295,000, which shall be known as the "Direct Payment Amount," and which shall be distributed in the manner and for the purposes specified in this Consent Judgment and in Exhibit B. The Direct Payment Amount is comprised of: (i)

"Payments to Borrowers Affected by Service Transfer and Property Preservation Practices," in the amount of $6,434,100, and (ii) "Attorney's Fees and Costs," in the amount of $3,860,900, and shall be paid as directed in Paragraphs 7-11 below.

7. The Settlement Administrator appointed under Exhibit B shall create a Qualified Settlement Fund within the meaning of Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended. The Settlement Administrator shall also establish a distribution account (the "Qualified Settlement Fund Distribution Account") to receive the Direct Payment Amount from Nationstar.

8. *Payments to Borrowers Affected by Service Transfer and Property Preservation Practices.* No later than 10 days after the date on which the Order is entered by the Court, consistent with this Consent Judgment, Exhibit B, and instructions provided by the Executive Committee, the Defendant shall deposit $6,434,100 (the "Borrower Payment Amount") of the Direct Payment Amount, by electronic funds transfer, into the Qualified Settlement Fund Distribution Account. The Borrower Payment Amount and any other funds provided to the Settlement Administrator under paragraph 9 shall be administered in accordance with the terms set forth in this Consent Judgment and Exhibit B. The Borrower Payment Amount shall be used: (1) for payments to borrowers who submit claims and are in either or both of the Service Transfer and Property Preservation Populations set forth below; and (2) for reasonable costs and expenses of the Settlement Administrator, including taxes and fees for tax counsel. The Populations eligible to receive payments are defined as follows:

a. *Service Transfer Population.* The Service Transfer Population shall mean borrowers whose loans (i) were transferred in bulk to Nationstar for servicing between and including February 1, 2011 and December 18, 2017, and (ii) which

became 30 days delinquent within 90 days of the service transfer, and (iii) which delinquency subsequently resulted in dispossession of the property in foreclosure, and (iv) which otherwise meet any additional criteria set by the Executive Committee; or

b. *Property Preservation Population.* The Property Preservation Population shall mean borrowers whose property was (i) subject to a property inspection by Nationstar or its agent, and (ii) was determined to be vacant, and (iii) as a result of that determination Nationstar or its agent changed the lock on the property between and including June 24, 2011 and December 29, 2017, and (iv) either within 30 days of the initial lock change the borrower requested access to the property, or within 90 days of the initial lock change the property was reported as occupied through a subsequent inspection, and (v) which otherwise meet any additional criteria set by the Executive Committee.

9. Only if the circumstances addressed in this Paragraph arise, Defendant shall also pay or cause to be paid any additional amounts necessary to pay claims of borrowers in either or both of the Service Transfer and Property Preservation Populations whose data is provided to the Settlement Administrator by Defendant after Defendant warranted (pursuant to Paragraph 3 of Exhibit B) that the data provided for those Populations is complete and accurate ("Subsequent Population"). Borrowers in any Subsequent Population will be eligible to receive the same per-loan check payment amount actually paid to eligible borrowers in the initial data population, after receiving a notice and making a valid claim under the process identical to that used for borrowers in the initial data population. If this Paragraph becomes applicable, the Parties will work with the Settlement Administrator to determine both the amount of additional funding

required to make payments to eligible borrowers in any Subsequent Population, and the additional settlement administration costs and expense involved for administering potential claims of any Subsequent Population.

10. *Attorney's Fees and Costs*. Within 10 days of the date on which the Order is entered by the Court, Defendant shall deposit a collective total of $3,860,900 (the Attorney's Fees and Costs portion of the Direct Payment Amount) into the Qualified Settlement Fund Distribution Account. The Attorney's Fees and Costs shall be allocated and distributed in accordance with Exhibit D to the State Attorneys General of Arizona, California, Colorado, Connecticut, Florida, Illinois, Iowa, Nevada, North Carolina, Ohio, Oregon, Texas, and Washington (collectively, the "Investigating Attorneys General"), to be used for purposes including, but not limited to, attorney's fees, investigative costs and fees, future expenditures relating to the investigation and prosecution of cases involving fraud, unfair and deceptive acts and practices, and other illegal conduct related to financial services or state consumer protection laws to the extent practicable or as otherwise authorized by law. The Settlement Administrator shall distribute the Attorney's Fees and Costs within fifteen (15) days of the Settlement Administrator's receipt of written payment processing instructions from an individual Investigating Attorney General.

11. After Defendant has made a required deposit into the Qualified Settlement Fund Distribution Account, Defendant shall no longer have any property right, title, interest or other legal claim in those funds.

12. Defendant shall file a notice with the Court after the Borrower Payment Amount is deposited into the Qualified Settlement Fund Distribution Account. Defendant shall also file a

notice with the Court after the Attorney's Fees and Costs is deposited into the Qualified Settlement Fund Distribution Account. The notices can be combined.

13. The full and timely deposit of both the Borrower Payment Amount and the Attorney's Fees and Costs into the Qualified Settlement Fund Distribution Account pursuant to this Order shall satisfy the judgment for the Direct Payment Amount.

**Payments to Other Government Entities**

14. Pursuant to the State Mortgage Regulators' Consent Order, Defendant has agreed to pay an administrative penalty and administrative costs of $1,205,000 to the State Mortgage Regulators.

15. Pursuant to the CFPB's Consent Judgment, Defendant has agreed to pay a civil money penalty of $1,500,000 to the CFPB.

16. Pursuant to the State Mortgage Regulators' Consent Order and the CFPB's Consent Judgment, Defendant has agreed to pay $15,623,305 to redress additional defined populations of borrowers, as described in those settlements.

**Defendant's Self-Remediation**

17. In conjunction with regulatory supervision by the State Mortgage Regulators and CFPB and investigations by the Plaintiff States and CFPB, Defendant has represented that it has paid or provided $57,723,049 in consumer remediation to borrowers prior to execution of this Consent Judgment. Such consumer remediation includes:

a. $16,242,809 for the failure to appropriately identify in-flight modifications when a loan was being onboarded for servicing;

b. $8,478,960 for having collected monthly modified mortgage loan payment amounts on certain loans where the amounts charged for principal and interest exceeded the principal and interest amount contained in the trial plan agreement;

c. $93,307 for failure to timely remit property tax payments;

d. $10,832,738 for failure to timely remove private mortgage insurance;

e. $1,250,000 for having foreclosed while borrowers were pursuing certain loss mitigation options; and

f. $20,825,235 for collecting escrow shortages for borrowers on a completed Chapter 13 bankruptcy plan that were not legally due.

18. By entering into this Consent Judgment, Defendant affirms and certifies that it has provided the consumer remediation referenced in Paragraph 17.

19. By reciting in this Consent Judgment information about the CFPB Consent Judgment and the State Mortgage Regulators' Consent Order, neither this Court nor any State Attorney General is granted or acquires jurisdiction or authority to enforce the CFPB Consent Judgment or the State Mortgage Regulators' Consent Order.

## V. SERVICING STANDARDS COMPLIANCE TESTING AND REPORTING

20. *Internal or External Compliance Testing.* Defendant shall conduct transactional testing and compliance/controls testing, either internally or by retaining the services of a third-party firm, to assess Defendant's compliance with the Servicing Standards attached as Exhibit A to this Consent Judgment. The testing shall be conducted in the ordinary course of Defendant's business consistent with industry standards and Defendant's internal testing schedule, which shall be based on an assessment of high-risk areas and emerging trends.

a. All internal testing of compliance with the Servicing Standards will be conducted via three separate "lines of defense." First, at the business level, business line managers will monitor routine operations to identify potential issues and evaluate operations for risk. Second, the Risk and Compliance department will conduct tests of both random and targeted loan populations. Third, the Internal Audit department will conduct risk-based testing.

b. As part of its compliance testing, Defendant shall conduct monthly tests for loans from all fifty states. Each test will be comprised of a review of an appropriate and representative sample to assess compliance. Testing will include inspection of loan documentation, review of loan servicing system notes or data, and management inquiries/interviews.

21. *Nationstar Internal Audit*. Defendant's Internal Audit department shall conduct audits of Defendant's servicing functions, including Defendant's compliance with the Servicing Standards. Internal Audit shall include the Servicing Standards in its annual risk assessment, which forms the basis for its annual audit plan, and shall conduct audits in accordance with its annual risk assessment and annual audit plan. Defendant's internal auditing schedule shall be based on an assessment of high risk areas and emerging trends. The audits shall be conducted in the ordinary course of Defendant's business consistent with industry standards and this Consent Judgment.

a. As part of its Internal Audit program, Defendant shall conduct audits using a risk-based approach. Defendant will conduct an annual risk assessment (including servicing reviews) to determine the frequency at which each Servicing Standard

shall be tested. Defendant shall assess compliance with each Servicing Standard by reviewing an appropriate and representative sample. Sample populations will be selected based on the attributes of the process and control that is being tested and will be reviewed for completeness and accuracy.

b. Defendant shall provide the annual audit plan for the Servicing Standards to the Executive Committee at least 30 days prior to the Implementation Date. The audit plan shall include the proposed schedule by which Defendant will test each Servicing Standard. If requested by the Executive Committee within 30 days of receipt of the audit plan, the Executive Committee and Defendant shall participate in a meet and confer to discuss any potential objections or concerns with the audit plan. Defendant shall also provide any proposed changes to the audit plan to the Executive Committee at least 30 days before the change is to take effect, and the Executive Committee shall have the right to request a meet and confer within 30 days to discuss any potential objections or concerns.

c. The annual audit plan, including which audits will be conducted in the coming year, shall be approved by the Audit and Risk Committee of Defendant's Board of Directors. The Audit and Risk Committee shall receive summaries of all audit results throughout the year, as well as, progress reports on open issues.

22. *Corrective Action Activity*. In the event material deficiencies are identified through testing or audits, Defendant shall perform a root cause analysis and determine whether corrective action activity, including a plan for remediation of any consumer harm, is necessary. As part of Defendant's root cause analysis, Defendant will examine whether the issue is

systematic or isolated, whether it impacts policies and procedures, whether it impacts Defendant's training procedures, whether it impacts Defendant's technology, and the issue's impact on Defendant's testing and audit procedures, and Defendant will correct the issue as appropriate.

23. *Executive Committee*. The Executive Committee shall serve as the point of contact between Defendant and the Plaintiff States and shall receive reports and communications from Defendant.

24. *Reports*. Defendant shall submit to the Executive Committee on a quarterly basis (1) any Nationstar Risk, Compliance, and Internal Audit reports evaluating Defendant's compliance with the Servicing Standards during the preceding quarter; (2) any internal or external transactional testing results and compliance/controls testing results conducted with regard to the Servicing Standards; (3) any root-cause analysis and plan for corrective action activity developed or performed by Defendant with regard to the Servicing Standards during the preceding quarter; and (4) reporting on Defendant's progress on any prior corrective action plan (collectively, the "Reports"). Defendant shall submit Reports within 45 days following the end of each quarter while the servicing standards are in effect. Defendant's final report shall be issued within 45 days following the end of the 3rd quarter of 2023.

25. *Confidentiality*. Defendant does not waive any privileges it may otherwise assert by submitting Reports pursuant to this section. Specifically, Defendant shall designate as "CONFIDENTIAL" that portion of any report, supervisory and any supporting information, document, or portion of a document or other tangible thing provided by Defendant to the Executive Committee, any member thereof, or to any government signatory that Defendant

believes contains a trade secret or confidential research, development, or commercial information subject to protection under applicable state or federal laws (collectively, "Confidential Information"). The following provisions shall apply to the treatment of Confidential Information:

a. Except as provided by these provisions, all Confidential Information shall be identified as such in a document executed by a representative of Defendant prior to or simultaneous with furnishing of a Report and shall cite the basis for the privilege asserted as to each identified portion.

b. The Executive Committee, any member of the Executive Committee, and any government signatory receiving Reports and any Confidential Information therein agree to protect Confidential Information to the extent permitted by law, except as needed to support a public enforcement action.

c. A Plaintiff State who is not a member of the Executive Committee may request and obtain Reports and any Confidential Information therein, provided that it (i) agrees to adhere to the provisions herein; and (ii) participates in a meet and confer with the Executive Committee to discuss the request.

d. To the extent that the Executive Committee, any member of the Executive Committee, or any Plaintiff State receives a subpoena or court order or other request for production of Confidential Information, the Plaintiff State shall, unless prohibited under applicable law, notify Defendant of such request and if the Plaintiff State is required to disclose Confidential Information pursuant to state or federal law, advise Defendant of the disclosure as soon as is practicable to enable

Defendant to seek a protective order or stay of production of Confidential Information.

e. The confidentiality provisions of Paragraph 25 are binding on the Parties only to the extent that it does not violate any court order, constitutional provision, or statute prohibiting such confidentiality.

26. *Auditing Period*. The auditing and reporting period shall be for three years, commencing on the Implementation Date.

## VI. ENFORCEMENT

27. Prior to initiating an action to enforce this Consent Judgment or any term hereof, a Plaintiff State shall: (1) provide written notice to the Executive Committee and Defendant of the basis for the potential action and a description of its allegations; (2) meet and confer with Defendant, if requested by the Defendant, within the first 30 days of issuing the written notice; and (3) allow Defendant 30 days to respond to such notice in writing.

28. Subject to the Release in Exhibit C, this Consent Judgment shall in no way preclude a Plaintiff State from immediately bringing an action without notice against Defendant if necessary to prevent immediate and irreparable harm and protect the health, safety, and welfare of the public.

29. This Court retains jurisdiction to interpret and to enforce the terms of this Consent Judgment. The Parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court. This Consent Judgment may be modified only by order of this Court.

30. An enforcement action under this Consent Judgment may be brought solely by a Party. No provision of this Consent Judgment shall be construed as providing a private right of action to enforce the terms of this Consent Judgment.

## VII. RELEASE

31. The Attorneys General and Defendant have agreed, in consideration for the terms provided herein, for the release of certain claims and remedies, as provided in the Release, attached hereto as Exhibit C. The Attorneys General and Defendant have also agreed that certain claims and remedies are not released, as provided in Part III of Exhibit C. The Release contained in Exhibit C shall become effective upon (a) entry of this Consent Judgment, and (b) payment of the Borrower Payment Amount.

## VIII. OTHER TERMS

32. Any Attorney General may withdraw from this Consent Judgment and declare it null and void with respect to that party if Nationstar fails to make any payment required under this Consent Judgment and such non-payment is not cured within thirty days of written notice by the withdrawing Attorney General.

33. Any notices to Nationstar required or contemplated by this Consent Judgment shall be delivered, if not otherwise described herein, by electronic copy to Nationstar through the "Primary Company Contact" for Nationstar listed in the Nationwide Multistate Licensing System (NMLS).

34. Nothing in this Consent Judgment shall relieve Defendant of its obligation to comply with applicable state and federal law.

35. In the event of a conflict between the terms of the Exhibits and Paragraphs 1-34 above, the terms of the Exhibits shall govern.

SO ORDERED this _____ day of __________________, 20____

_____________________________________
UNITED STATES DISTRICT JUDGE

For Nationstar Mortgage LLC, d/b/a Mr. Cooper

_/s/ Jay Bray___________________________
JAY BRAY
President and Chief Executive Officer
Nationstar Mortgage LLC, dba
Mr. Cooper
8950 Cypress Waters Blvd
Coppell, TX 75019

For the State of Alabama:

/s/ Olivia Martin___________________

OLIVIA MARTIN
Assistant Attorney General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel.: 334-242-7335
Fax: 334-242-2433
Olivia.Martin@AlabamaAG.gov

For the State of Alaska:

CLYDE "ED" SNIFFEN, JR.
Acting Attorney General

/s/ Ian Engelbeck___________
IAN R. ENGELBECK
Alaska Bar No. 2010094
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Ste. 200
Anchorage, AK 99501
Tel.: 907-269-5200
Fax: 907-276-3697
Ian.Engelbeck@alaska.gov

For the State of Arizona:

MARK BRNOVICH
Arizona Attorney General

/s/ Matthew du Mee________________
MATTHEW DU MEE
Consumer Litigation Unit Chief Counsel
2005 N. Central Ave.
Phoenix, AZ 85004-1592
Tel.: 602-542-5025
Fax: 602-542-4085
Matthew.duMee@azag.gov

For the State of Arkansas:

LESLIE RUTLEDGE
Attorney General

/s/ Johnathan R. Carter
JOHNATHAN R. CARTER
(Ark. Bar No. 2007105)
Assistant Attorney General
Arkansas Attorney General's Ofiice
323 Center Street, Suite 200
Little Rock, AR 72201
Tel.: 501.682.8063
Johnathan.Carter@arkansasag.gov

For the People of the State of California:

XAVIER BECERRA
Attorney General

/s/ Tina Charoenpong___________
TINA CHAROENPONG
Deputy Attorney General
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel.: 213-269-6000
Fax: 213-897-4951
Tina.Charoenpong@doj.ca.gov

For the State of Colorado, *ex rel.*

PHILIP J. WEISER
Attorney General

/s/ Jennifer Miner Dethmers
JENNIFER MINER DETHMERS
Senior Assistant Attorney General
Jennifer.Dethmers@coag.gov

/s/Nikolai Frant
NIKOLAI FRANT
First Assistant Attorney General
Nikolai.frant@coag.gov

Colorado Department of Law
Consumer Protection Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Tel.: 720-508-6229
Fax: 720-508-6040

For the State of Connecticut:

WILLIAM TONG
Attorney General

/s/ Joseph Chambers____________________
JOSEPH J. CHAMBERS
Assistant Attorney General
Finance Department Head
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Tel.: 860-808-5270
Joseph.Chambers@ct.gov

For the State of Delaware:

/s/ Michael Clarke___________
MICHAEL CLARKE
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Tel.: 302-577-8308
Fax: 302-577-8426
Michael.Clarke@delaware.gov

For the District of Columbia:

KARL A. RACINE
Attorney General for the District of Columbia

/s/ Benjamin Wiseman_______________

BENJAMIN WISEMAN, DC Bar # 1005442
Director, Office of Consumer Protection
Office of the Attorney General
400 6th Street, N.W., 10th Floor
Washington, DC 20001
Tel.: 202-741-5226
Fax: 202-741-8949
Benjamin.Wiseman@dc.gov

For the State of Florida:

ASHLEY MOODY
Attorney General

VICTORIA A. BUTLER
Director, Consumer Protection Division

/s/ Sasha Funk Granai_______________

SASHA FUNK GRANAI
Deputy Director
Consumer Protection Division
Office of the Florida Attorney General
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Tel.: 813-287-7950
Fax: 813-281-5515
Sasha.FunkGranai@myfloridalegal.com

For the State of Georgia:

CHRISTOPHER M. CARR
Attorney General

/s/ Alkesh Patel___________________
Alkesh Patel
Assistant Attorney General
Commercial Transactions & Litigation
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
Tel.: 404-458-3598
APatel@LAW.GA.GOV

For the State of Hawaii:

/s/ James C. Paige_______________
JAMES C. PAIGE
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813
Tel.: 808-586-1500
Fax: 808-586-1239
James.C.Paige@hawaii.gov

For the State of Idaho

LAWRENCE WASDEN
Attorney General:

/s/ Stephanie Guyon_______________
STEPHANIE GUYON
Deputy Attorney General
Office of the Idaho Attorney General
954 W. Jefferson St., 2nd Fl.
PO Box 83720
Boise, ID 83720-0010
Tel.: 208-334-2424
Fax: 208-334-4151
Stephanie.guyon@ag.idaho.gov

For the State of Illinois:

KWAME RAOUL
Attorney General

/s/ Andrew Dougherty_______________
ANDREW DOUGHERTY
Deputy Bureau Chief, Consumer Fraud
Illinois Attorney General's Office
100 W. Randolph, 12th Floor
Chicago, IL 60601
Tel.: 312-814-4982
Fax: 312-814-2593
adougherty@atg.state.il.us

For the State of Indiana:

/s/ Scott Barnhart____________________________

SCOTT BARNHART
Chief Counsel and Director of Consumer Protection
Office of the Indiana Attorney General
302 West Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Tel.: 317-232-6309
Fax: 317-232-7979
Scott.Barnhart@atg.in.gov

For the State of Iowa:

TOM MILLER
Iowa Attorney General

/s/ Patrick Madigan

PATRICK MADIGAN
Assistant Attorney General
Office of the Attorney General of Iowa
Hoover State Office Building
1305 E. Walnut St.
Des Moines, IA 50319
Tel.: 515-281-5926
Patrick.Madigan@ag.iowa.gov

For the State of Kansas:

Attorney General DEREK SCHMIDT

/s/ Kathryn Carter__________
KATHRYN CARTER
Deputy Attorney General
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612
Tel.: 785-368-8407
Fax: 785-291-3699
Kate.Carter@ag.ks.gov

For the Office of the Attorney General of Kentucky:

DANIEL CAMERON
Attorney General

/s/ Don Rodgers_______________
DON RODGERS
Assistant Attorney General
Commonwealth of Kentucky
State Capitol, Suite 118
700 Capital Avenue
Frankfort, Kentucky 40601-3449
Tel.: 502-696-5300
Fax: 502-564-2894
Don.Rodgers@ky.gov

For the State of Louisiana:

JEFF LANDRY
Attorney General

/s/ Arham Mughal___________________

Arham Mughal, La. Bar Roll No. 38354
Assistant Attorney General
Public Protection Division
1885 North Third Street
Baton Rouge, Louisiana 70802
Tel.: 225-326-6439
Fax: 225-326 -6499
MughalA@ag.louisiana.gov

For the State of Maine:

AARON M. FREY
Attorney General

/s/ Linda Conti____________________
LINDA CONTI
Assistant Attorney General
Office of the Maine Attorney General
Burton Cross Office Building, 6th Floor
111 Sewall Street
6 State House Station
Augusta, Maine 04330
Tel.: 207-626-8800
Fax: 207-624-7730
Linda.Conti@maine.gov

For the State of Maryland:

BRIAN E. FROSH
Attorney General

/s/ Shelly M. Martin
SHELLY M. MARTIN, DC Bar # 473462
Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202
Tel.: 410-576-6522
Fax: 410-576-6566
smartin@oag.state.md.us

For the Commonwealth of Massachusetts:

MAURA HEALEY
Attorney General

/s/ Michael Lecaroz__________
MICHAEL LECAROZ
Mass. BBO # 672397
Assistant Attorney General
Consumer Protection Division
One Ashburton Place
Boston, MA 02108
Tel.: 617-727-2200
Michael.Lecaroz@mass.gov

For the State of Michigan:

DANA NESSEL
Attorney General

/s/ Kathy Fitzgerald___________
KATHY FITZGERALD
MI Bar # 31454
Assistant Attorney General
525 W. Ottawa Street, 5th Floor
PO Box 30736
Lansing, MI 48909
Tel.: 517-335-7632
Fax: 517-335-6755
Fitzgeraldk@michigan.gov

For the State of Minnesota**:**

KEITH ELLISON
Attorney General

/s/ Caitlin Micko________________
CAITLIN MICKO
Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: 651-724-9180
Fax: 651-282-5832
Caitlin.Micko@ag.state.mn.us

For the State of Mississippi:

LYNN FITCH
Attorney General

/s/ Seth Shannon________________
SETH SHANNON
MS Bar #103466
Special Assistant Attorney General
PO Box 220
Jackson, MS 39205
Tel.: 769-237-6406
seth.shannon@ago.ms.gov

For the State of Missouri:

ERIC S. SCHMITT
Attorney General

/s/ Michael Schwalbert__________
MICHAEL SCHWALBERT
MO Bar #63229
Assistant Attorney General
815 Olive Street, Suite 200
Saint Louis, Missouri 63101
Phone: 314-340-7888
Fax: 314-340-7981
michael.schwalbert@ago.mo.gov

For the State of Montana:

TIMOTHY C. FOX
Attorney General

/s/ Chuck Munson____________
CHUCK MUNSON
Assistant Attorney General
Montana Department of Justice
215 N. Sanders
Helena MT 59624
Tel.: 406-444-2026
Fax: 406-444-3549
Cmunson@mt.gov

For the State of Nebraska:

DOUGLAS J. PETERSON,
Attorney General #18146

/s/ Jocelyn Brasher___________________
JOCELYN J. BRASHER, #26011
Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Tel.: 402-471-1279
Jocelyn.Brasher@nebraska.gov

For the State of Nevada:

AARON D. FORD
Attorney General
Bureau of Consumer Protection

/s/ Sheri Ann Forbes______________
SHERI ANN FORBES
Senior Deputy Attorney General
Nevada Bar No. 7337
555 E. Washington Avenue, Ste. 3900
Las Vegas, Nevada 89101
Tel.: 702-486-3085
Fax: 775-684-1299
SForbes@ag.nv.gov

For the State of New Hampshire:

/s/ Robert F. Adams________________
ROBERT F. ADAMS
DC Bar # 259515 (inactive status)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Department of Justice
33 Capitol Street
Concord, New Hampshire 03301
Tel.: 603-271-2678
Fax: 603-271-2110
Robert.F.Adams@doj.nh.gov

For the State of New Jersey:

GURBIR S. GREWAL
Attorney General of New Jersey

/s/ Donna J. Dorgan_______________
DONNA J. DORGAN
Deputy Attorney General
Consumer Fraud Prosecution Section
Division of Law
124 Halsey Street - 5th Floor
PO Box 45029
Newark, NJ 07102
Tel.: (973) 648-3546
Fax: (973) 648-4887
Donna.Dorgan@law.njoag.gov

For the State of New Mexico:

HECTOR H. BALDERAS
Attorney General

/s/ Lisa Giandomenico
LISA GIANDOMENICO
Assistant Attorney General
Office of the New Mexico Attorney General
Consumer & Environmental Protection Division
201 Third St NW, Suite 300
Albuquerque, NM 87102
Tel.: 505-490-4846
Fax: 505-318-1051
LGiandomenico@nmag.gov

For the State of New York:

LETITIA JAMES
Attorney General

/s/ Jane M. Azia
JANE M. AZIA
Bureau Chief
Bureau of Consumer Frauds & Protection
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Tel.: 212-416-8727
Fax: 212-416-6003
Jane.Azia@ag.ny.gov

For the Attorney General of North Carolina:

JOSH STEIN
Attorney General

/s/ Keith Clayton______________
KEITH T. CLAYTON
Special Deputy Attorney General
N.C. Department of Justice
P. O. Box 629
Raleigh, NC 27602
Tel.: 919-716-6000
Fax: 919-716-6019
Kclayton@ncdoj.gov

For the State of North Dakota

WAYNE STENEHJEM
Attorney General

/s/ Parrell D. Grossman__________________
PARRELL D. GROSSMAN
(ID No. 04684)
Assistant Attorney General
Director, Consumer Protection
and Antitrust Division
Office of Attorney General
Gateway Professional Center
1050 E Interstate Ave, Ste. 200
Bismarck, ND 58503-5574
Tel.: 701-328-5570
Fax: 701-328-5568
Pgrossman@nd.gov

For the State of Ohio:

DAVE YOST
Ohio Attorney General

/s/ Tracy Morrison Dickens________________
TRACY MORRISON DICKENS
(Ohio Bar #0082898)
Tracy.Dickens@ohioattorneygeneral.gov

TIMOTHY W. EFFLER
(Ohio Bar #0083768)
Timothy.Effler@ohioattorneygeneral.gov

Assistant Attorneys General
Consumer Protection Section
30 E. Broad St., 14th Floor
Columbus, Ohio 43215
Tel.: 614-644-9618
Fax: 866-449-0989

For the State of Oklahoma:

MIKE HUNTER
Attorney General for the State of Oklahoma

/s/ Malisa McPherson_________________
MALISA MCPHERSON, OBA #32070
Assistant Attorney General
Deputy Chief, Consumer Protection Unit
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Tel.: 405-521-3921
Fax: 405-522-0085
Malisa.McPherson@oag.ok.gov

For the State of Oregon:

ELLEN ROSENBLUM
Attorney General

/s/ D. Althea Cullen______________
D. ALTHEA CULLEN
Assistant Attorney General
Oregon Department of Justice
Financial Fraud/Consumer Protection
100 SW Market St.
Portland, OR 97201
Tel.: 971-673-1880
Fax: 971-673-1888
Althea.d.cullen@doj.state.or.us

For the Commonwealth of Pennsylvania

JOSH SHAPIRO
Attorney General

/s/ Nicholas F.B. Smyth________
NICHOLAS F. B. SMYTH
DC Bar # 1012913 (inactive status)
Senior Deputy Attorney General
Commonwealth of Pennsylvania
Office of Attorney General
1251 Waterfront Pl, Level M
Pittsburgh, PA 15222
Tel: 412-880-0475
Fax: 412-880-0196
Nsmyth@attorneygeneral.gov

For the State of Rhode Island:

PETER F. NERONHA
Attorney General

/s/ David Marzilli________________________
DAVID MARZILLI
Rhode Island Office of the Attorney General
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: 401-274-4400 Ext. 2030
Fax: 401-222-1302
DMarzilli@riag.ri.gov

For the State of South Carolina:

ALAN WILSON
Attorney General

/s/ Jared Libet______________________
JARED Q. LIBET
Assistant Deputy Attorney General
South Carolina Attorney General's Office
1000 Assembly Street
Columbia, SC 29201
Tel.: 803-734-3970
Fax: 803-734-3677
Jlibet@scag.gov

For the State of South Dakota:

/s/ Philip D. Carlson________________
PHILIP D. CARLSON
Assistant Attorney General
South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel.: 605-773-3215
Fax: 605-773-4106
Phil.Carlson@state.sd.us

For the State of Tennessee:

HERBERT H. SLATERY III
Attorney General and Reporter

/s/ Travis Brown______________________

TRAVIS BROWN, B.P.R. No. 034164
Assistant Attorney General
Office of the Tennessee Attorney General
Public Protection Section
Consumer Protection Division
315 Deaderick St., 20th Fl.
Nashville, TN 37243
Tel.: (615) 741-3533
Fax: (615) 532-2510
Travis.Brown@ag.tn.gov
*Attorney for the State of Tennessee*

For the State of Texas:

/s/ Richard Bischoff____________
RICHARD L. BISCHOFF
Assistant Attorney General
Consumer Protection Division
401 E. Franklin Avenue, Suite 530
El Paso, Texas 79901
Tel.: 915- 834-5800
Fax: 915-542-1546
Richard.Bischoff@oag.texas.gov

For the State of Utah:

/s/ Sean D. Reyes______________

SEAN D. REYES
Utah Attorney General,
including as counsel for the Utah Division of Consumer Protection
350 North State Street, #230
Salt Lake City, UT 84114-2320
Tel.: 801-538-1191
Fax: 801-538-1121
uag@agutah.gov

For the State of Vermont:

THOMAS J. DONOVAN, JR.
Attorney General

/s/ James Layman___________
JAMES LAYMAN
Assistant Attorney General
109 State Street
Montpelier, VT 05609-1001
Tel.: 802-828-2315
James.Layman@vermont.gov

For The Commonwealth of Virginia,
*ex rel.* MARK R. HERRING,
Attorney General:

/s/ James E. Scott
JAMES E. SCOTT (VSB #88882)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Tel.: 804-225-4778
Fax: 804-786-0122
JScott@oag.state.va.us

For the State of Washington:

ROBERT FERGUSON
Attorney General

/s/ Amy Teng________________
AMY TENG, WSBA #50003
Assistant Attorney General
Consumer Protection Division
Washington State
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel: 206-464-7744
Fax: 206-587-5636
Amy.teng@atg.wa.gov

For the State of West Virginia:

PATRICK MORRISEY
Attorney General

/s/ Tanya L. Godfrey
TANYA L. GODFREY, DC Bar # 1016435
Assistant Attorney General
Office of the West Virginia Attorney General
Consumer Protection and Antitrust Division
PO Box 1789
Charleston, WV 25326
Tel.: 304-558-8986
Fax: 304-558-0184
Tanya.L.Godfrey@wvago.gov

For the State of Wisconsin:

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Colin R. Stroud_____________
Colin R. Stroud
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel.: 608-261-9224
Stroudcr@doj.state.wi.us

For the State of Wyoming:

BRIDGET HILL
Wyoming Attorney General

/s/ Benjamin M. Burningham
BENJAMIN M. BURNINGHAM
(Wyo. Bar No. #7-5616)
(DC Bar No. # 1021923) (inactive status)
Senior Assistant Attorney General
Kendrick Building
2320 Capitol Avenue
Cheyenne, WY 82002
Tel.: 307-777-7847
Fax: 307-777-3435
Ben.Burningham@wyo.gov

# EXHIBIT A

## SERVICING STANDARDS

The provisions outlined below are intended to apply to loans secured by a forward mortgage on owner-occupied properties that serve as the primary residence of the borrower unless otherwise noted herein.

### I. ACCOUNT AND BANKRUPTCY INFORMATION AND DOCUMENTATION.

Unless otherwise specified, these provisions shall apply to bankruptcy and foreclosures in all jurisdictions regardless of whether the jurisdiction has a judicial, non-judicial, or quasi-judicial process for foreclosures and regardless of whether a statement is submitted during the foreclosure or bankruptcy process in the form of an affidavit, sworn statement, or declaration(s) under penalty of perjury (to the extent stated to be based on personal knowledge) ("Declaration").

A. Standards for Documents Used in Foreclosure and Bankruptcy Proceedings.

1. Servicer shall ensure that factual assertions made in pleadings (complaint, counterclaim, cross-claim, answer, or similar pleadings) and bankruptcy proofs of claim (including any facts provided by Servicer or based on information provided by Servicer that are included in any attachment and submitted to establish the truth of such facts) ("POC") are accurate and complete and are supported by competent and reliable evidence. As it relates solely to foreclosure proceedings, Servicer shall continue to ensure that Declarations, affidavits, and sworn statements filed by or on behalf of Servicer in judicial foreclosure proceedings and notices of default, notices of sale, and similar notices submitted by or on behalf of Servicer in non-judicial foreclosures are accurate and complete and are supported by competent and reliable evidence. This provision does not apply to Declarations signed by counsel based solely on counsel's knowledge (such as affidavits of counsel relating to service of process, extensions of time, or fee petitions) that are not based on a review of Servicer's books and records.

2. Before a loan is referred to non-judicial foreclosure, Servicer shall ensure that documents and records pertaining to the borrower's loan status and loan information have been reviewed to substantiate the borrower's default and the right to foreclose. Servicer shall retain a copy of documents and records that substantiate any initiation of a foreclosure.

3. As it relates solely to foreclosure proceedings, Servicer shall continue to ensure that affidavits, sworn statements, and Declarations are based on personal knowledge, which may be based on the affiant's review of Servicer's books and records, in accordance with the evidentiary requirements of applicable state or federal law.

4. Servicer shall continue to review and approve standardized forms of affidavits, standardized forms of sworn statements, and standardized forms of Declarations prepared by or signed by an employee or officer of Servicer, or executed by a third party using a power of attorney on behalf of Servicer, to ensure compliance with applicable law, rules, court procedure, and the terms of this Agreement ("this Agreement").

5. As it relates solely to foreclosure proceedings, affidavits, sworn statements, and Declarations shall continue to accurately identify the name of the individual declarant/affiant ("affiant"), the entity of which the affiant is an employee, and the affiant's title. Affiants shall continue to date their signatures on affidavits, sworn statements, or Declarations.

6. As it relates solely to foreclosure proceedings, Servicer shall continue not to pay volume-based or other incentives to employees or third-party providers or trustees that encourage undue haste or lack of due diligence over quality in the foreclosure process.

7. As it relates solely to foreclosure proceedings, Servicer shall continue to maintain records in accordance with applicable state or federal record retention requirements that identify all notarizations of Servicer documents executed by each notary employed by Servicer.

8. Prior to making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, Servicer shall validate the note or, if necessary, create a lost note affidavit, and Servicer shall conduct a legal entity review, which will include a chain of title review, as well as verification of the identity of the investor. Within 5 business days after referral to foreclosure, or at a later date if necessary to comply with applicable law, Servicer or Servicer's counsel shall send borrowers a letter containing the information required in paragraphs I.B.6, III.D.4, and IX.A.2 of this Agreement.

B. Requirements for Accuracy and Verification of Borrower's Account Information.

1. Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format.

2. Unless a contrary payment application is required by the mortgage, note, or court order, Servicer must apply payments in accordance with the borrower's instructions. Servicer's payment coupons and online payment submission screen must include a payment instruction line for any payment or payment portion that exceeds the current amount due. If Servicer cannot apply a payment in accordance with the borrower's instructions, Servicer must maintain information sufficient to explain why the payment was not posted in accordance with instructions and must engage in efforts to resolve disputes brought to Servicer's attention concerning the borrower's instructions.

3. For any loan on which interest is calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, as well as non-conforming

payments, unless such application conflicts with contract provisions or prevailing law. Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer and credited as of the date received to borrower's account (unless applicable law requires a shorter period for posting).

4. For any loan on which interest is not calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower conforming payments, including cure payments (where authorized by law or contract), unless such application conflicts with contract provisions or prevailing law. Servicer shall continue to accept trial modification payments consistent with existing payment application practices. Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer (unless applicable law requires a shorter period for posting).

   a. Servicer shall accept and apply at least two non-conforming payments from the borrower, in accordance with this subparagraph, when the payment, whether on its own or when combined with a payment made by another source, comes within $50.00 of the scheduled payment, including principal and interest and, where applicable, taxes and insurance.

   b. Except for payments described in paragraph I.B.4.a, Servicer may post partial payments to a suspense or unapplied funds account, provided that Servicer (1) discloses to the borrower the existence of a suspense or unapplied funds account and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments as required by the terms of the loan documents. Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current or other final disposition of the loan.

5. Notwithstanding the provisions above, Servicer shall not be required to accept payments which are insufficient to pay the full balance due after the borrower has been provided written notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated. If a borrower files for bankruptcy after the contractual payments have been accelerated, Servicer may reject payments that are insufficient to pay the full balance, so long as rejection of the payments is not prohibited by an order of the bankruptcy court.

6. In the statement described in paragraph I.A.8, Servicer shall notify borrowers that they may receive, upon written request:

a. A copy of the borrower's payment history since the borrower was last less than 60 days past due;

b. A copy of the borrower's note;

c. If Servicer has commenced foreclosure or filed a POC, copies of any assignments of mortgage or deed of trust required to demonstrate the right to foreclose on the borrower's note under applicable state law; and

d. The name of the trust or owner that holds the borrower's loan.

7. As described in paragraph I.B.6 above, Servicer shall respond to a borrower's written request in writing, no later than 30 days after receipt of a borrower's written request.

8. Servicer shall adopt enhanced billing dispute procedures, including for disputes regarding fees. These procedures will include:

a. Establishing readily available methods for customers to lodge complaints and pose questions, such as by providing toll-free telephone numbers and accepting disputes by e-mail;

b. Assessing and ensuring adequate and competent staff to answer and respond to consumer disputes promptly;

c. Establishing a process for dispute escalation;

d. Tracking the resolution of complaints; and

e. Providing a toll-free telephone number on monthly billing statements.

f. Servicer shall comply with all other requirements of Section VIII of this Agreement in responding to billing disputes.

9. Servicer shall take appropriate action to promptly remediate any inaccuracies in borrowers' account information, including:

a. Correcting the account information;

b. Providing refunds directly to borrower or account credits;

c. Correcting inaccurate reports to consumer credit reporting agencies;

d. Communicating whatever corrective action was taken to the borrower and any authorized third party working on behalf of the borrower; and

e. Documenting within the Servicer's records whatever corrective action was taken and communicated to the borrower or the borrower's representative.

10. Servicer's primary system to record account information shall be periodically independently reviewed for accuracy and completeness by an independent reviewer.

11. Delinquent borrowers currently receiving regular periodic statements will receive periodic statements setting forth each of the following items, to the extent applicable. For delinquent borrowers currently using a coupon book, a delinquency notice compliant with applicable law will be provided.

a. The total amount needed to reinstate or bring the account current, and the amount of the principal obligation under the mortgage;

b. The date through which the borrower's obligation is paid;

c. The date of the last full payment;

d. The current interest rate in effect for the loan (if the rate is effective for at least 30 days);

e. The date on which the interest rate may next reset or adjust (unless the rate changes more frequently than once every 30 days);

f. The amount of any prepayment fee to be charged, if any;

g. A description of any late payment fees;

h. A telephone number and electronic mail address that may be used by the obligor to obtain information regarding the mortgage; and

i. The Web site to access either the Bureau list or the HUD list of homeownership counselors and counseling organizations and the HUD toll-free telephone number to access contact information for homeownership counselors or counseling organizations.

C. Documentation of Note, Holder Status and Chain of Assignment.

1. If the original note is lost or otherwise unavailable, Servicer shall continue to comply with applicable law in an attempt to establish ownership of the note and the right to enforcement. Servicer shall continue to ensure good faith efforts to obtain or locate a note lost while in the possession of Servicer or Servicer's agent and shall ensure that Servicer and Servicer's agents who are expected to have possession of notes or assignments of mortgage on behalf of Servicer adopt procedures that are designed to provide assurance that Servicer or Servicer's agent would locate a note or assignment of mortgage if it is in the possession or control of Servicer or Servicer's agent, as the case may be. In the event that Servicer prepares or causes to be prepared a lost note or lost assignment affidavit with respect to an original note or assignment lost while in Servicer's control, Servicer shall continue to use good faith efforts to obtain or locate the note or assignment in accordance with its procedures. In the affidavit, sworn statement or other filing documenting the lost note or assignment, Servicer shall continue to recite that Servicer has made a good faith effort in accordance with its procedures for locating the lost note or assignment.

2. Servicer shall continue to retain original notes that are still in force.

II. Vendor Oversight.

A. Servicer's Compliance Obligation

1. Servicer will comply with all of the Servicing Standards for loans it services, regardless of whether it performs the relevant servicing or default functions itself, using employees or contractors, or relies on a subsidiary, affiliate, or any vendor to do so.

B. Definitions

1. "Third-Party Provider" or "Third-Party Providers" shall mean any foreclosure firms, law firms, foreclosure trustees, subservicers, subsidiaries, affiliates, and any other vendor, agent, independent contractor, or other representative hired by Servicer or Xome that provide Servicing Activities.

2. "Fourth-Party Provider" or "Fourth-Party Providers" shall mean any person or entity retained by a Third Party Provider to perform Servicing Activities for loans serviced by Servicer.

3. "Servicing Activities" shall mean actions with direct or potential customer impact, including but not limited to foreclosure, bankruptcy, eviction, payment processing, customer communications, collections, property inspections and preservation, homeowner's insurance, tax payments, escrow account maintenance, and loss mitigation for loans serviced by Servicer.

C. Oversight Duties Applicable to Third-Party Providers.

1. Servicer shall adopt appropriate policies and processes to oversee and manage Third-Party Providers.

2. Servicer shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability. Servicer shall require each Third-Party Provider to perform an appropriate due diligence inquiry on any Fourth-Party Providers retained by the Third-Party Provider.

3. Servicer shall ensure that all information provided by Servicer to Third-Party Providers in connection with providing Servicing Activities is accurate and complete, and Servicer shall require that Third-Party Providers provide accurate and complete information to any Fourth-Party Providers.

4. Servicer shall ensure that foreclosure and bankruptcy counsel and foreclosure trustees have appropriate access to information from Servicer's books and records necessary to perform their duties in preparing pleadings and other documents submitted in foreclosure and bankruptcy proceedings.

5. Servicer shall require Third-Party Providers to disclose to Servicer any imposition of sanctions or professional disciplinary action taken against them for misconduct related to the performance of Servicing Activities. Servicer shall also ensure that Third-Party Providers require any Fourth-

Party Provider to disclose to the Third-Party Provider any imposition of sanctions or professional disciplinary action taken against the Fourth-Party Provider for misconduct related to the performance of Servicing Activities, and Servicer must require Third-Party Providers to disclose any such sanctions or disciplinary actions to Servicer.

6. Servicer shall require its Third-Party Providers to provide to Servicer routine reports, no less than quarterly, of written consumer complaints received by the Third-Party Provider, along with any response, that relate to Servicing Activities. Servicer shall be able to review and obtain the underlying documents surrounding consumer complaints received by the Third-Party Providers, as well as the action taken by the Third-Party Provider, including their response to the complaint. Servicer shall ensure that Third-Party Providers require Fourth-Party Providers to disclose written consumer complaints relating to Servicing Activities to the Third-Party Provider, along with any response.

7. Servicer shall adopt processes for reviewing and appropriately addressing written consumer complaints it receives from Third-Party Providers.

8. Servicer shall conduct periodic reviews of Third-Party Providers, which may be conducted remotely. These reviews shall include:

   a. A review of a sample of the foreclosure and bankruptcy documents prepared by the Third-Party Provider, to provide for compliance with applicable state and federal law and this Agreement in connection with the preparation of the documents, and the accuracy of the facts contained therein;

   b. A review of an appropriate sample of the fees and costs assessed by the Third Party Provider to ensure that only fees and costs that are lawful, reasonable, and actually incurred are charged to borrowers and that no portion of any fees or charges incurred by any Third Party Provider for technology usage, connectivity, or electronic invoice submission is charged as a cost to the borrower;

   c. Any evidence of the imposition of sanctions or professional disciplinary action taken against a Third-Party Provider or Fourth-Party Provider shall be considered by Servicer as part of its periodic review.

   d. Consumer complaints (including responses) received by Servicer relating to the performance of Servicing Activities by a Third-Party Provider or Fourth-Party Provider shall be considered by Servicer as part of its periodic review.

   e. A review of all regulatory actions relating to the Third-Party Provider's performance of Servicing Activities.

9. The periodic written review set forth in paragraph II.C.8, above, shall be conducted by a Servicer group independent of the business area to which the Third-Party Provider provides its services. The findings, methodology,

and conclusions of the periodic review shall be documented and maintained in accordance with paragraph X.A.3 of this Agreement. Servicer must make these records available to the Executive Committee upon request. Servicer shall take appropriate remedial steps if problems are identified through this review or otherwise, including, when appropriate, terminating its relationship with the Third-Party Provider.

10. The periodic written review set forth in paragraph II.A.8, above, must occur at least every 12 months for foreclosure, bankruptcy, and eviction counsel, as well as other Tier One Third Party Providers. All other Third-Party Providers shall be reviewed as required by Servicer's established risk-based review governance and third-party risk ranking framework, unless Servicer or the Executive Committee discover a material violation that reasonably warrants more frequent reviews to remediation violations and ensure future compliance.

D. Oversight Duties Applicable to Tier One Third-Party Providers.

Servicer shall adopt additional policies and processes to oversee and manage Third-Party Providers that have significant customer contact, hold material quantities of customer non-public information, or operate in consumer-protection regulated areas, including but not limited to foreclosure and bankruptcy counsel and foreclosure trustees ("Tier One Third-Party Providers"), including:

1. Servicer shall ensure that agreements, contracts, or oversight policies provide for adequate oversight, including measures to ensure timely action with respect to Tier One Third-Party Provider performance failures.

2. Servicer shall ensure that Tier One Third-Party Providers' processes provide for compliance with Servicer's policies and procedures concerning Servicing Activities, including compliance with the applicable servicing standards contained in this Agreement.

3. In addition to items described in II.C.8 above, Servicer's periodic reviews of Tier One Third-Party Providers, which may be conducted remotely, shall include:

   a. A review of the security of original loan documents maintained by the Third Party Provider;

   b. A review and evaluation of Tier One Third-Party Providers' policies and procedures regarding the identification and investigation into root causes of any material deficiencies or issues relating to its performance of Servicing Activities, the remediation of any deficiencies or issues, and the disclosure of such information to Servicer.

   c. A review of an appropriate sample of remediation provided by Tier One Third-Party Providers to ensure that consumer complaints have been adequately addressed.

4. Servicer shall require Tier One Third-Party Providers to notify Servicer of material deficiencies or issues relating to the performance of Servicing

Activities, and Servicer shall require Tier One Third-Party Providers to adequately address or correct any deficiencies or issues identified.

E. Restrictions and Oversight Duties Related to Affiliated Third-Party Providers.

Servicer shall not enter into a contractual relationship for Servicing Activities with a Third-Party Provider unless it is the result of an arm's-length transaction among unrelated entities or the associated fees do not exceed the lesser of (a) any fee limitation or allowable amount for the service under applicable state law, or (b) the market rate for the service. To determine the market rate, Servicer shall obtain annual market reviews of its affiliated Third-Party Provider's pricing for such services. Such market reviews shall be performed by a qualified, objective, independent third-party professional using procedures and standards generally accepted in the industry to yield accurate and reliable results and shall be provided to the Executive Committee by request. The independent third-party professional shall determine in its market survey the price charged by affiliated Third-Party Providers and charged by independent third-party providers. Arm's-length transaction means a transaction in which both parties are acting independently and in their own self-interest.

F. Additional Oversight of Activities by Third-Party Providers.

1. Servicer shall require a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for Servicer, on a periodic basis, as qualified to serve as a Third-Party Provider to Servicer, including that attorneys have the experience and competence necessary to perform the services requested, that attorneys are licensed to practice in the relevant jurisdiction, have the experience and competence necessary to perform the services requested, and that their services comply with applicable rules, regulations and applicable law (including state law prohibitions on fee splitting).

2. Servicer shall ensure that foreclosure and bankruptcy counsel and foreclosure trustees have an appropriate Servicer contact to assist in legal proceedings and to facilitate loss mitigation questions on behalf of the borrower.

3. Servicer shall adopt policies requiring Third-Party Providers to maintain records in accordance with applicable federal and state record retention requirements that identify all notarizations of Servicer documents executed by each notary employed by the Third-Party Provider.

G. Oversight of Activities by Fourth-Party Providers. Servicer shall require Third-Party Providers to notify Servicer when they retain vendors ("Fourth-Party Providers") to conduct Servicing Activities on behalf of Servicer. Servicer shall require Third-Party Providers to notify Servicer of any material deficiencies in the Servicing Activities provided by Fourth-Party Providers, of which a Third-Party Provider becomes aware as a result of audits or otherwise.

H. Additional Property Preservation Oversight and Obligations.

1. In addition to the oversight obligations described in this Section (II), Servicer shall also comply with the additional oversight and obligations specific to property preservation contained in this paragraph (II.H). As used in this paragraph (II.H) and paragraph III.C.5.m, the terms "Servicer" and "inspector" shall include Servicer or any provider who performs property preservation services on behalf of Servicer.

2. Servicer shall only inspect or secure a property when authorized to do so by the loan documents, investor guidelines, or law, unless expressly prohibited by law.

3. Servicer shall not remove personal property, or cause or allow the removal of personal property, unless the removal of personal property from the property is authorized by the borrower, a court order or otherwise authorized by applicable law, except that Servicer may remove personal property that is directly causing a health or infestation risk, such as rotting food.

4. Servicer shall only take possession of abandoned real property pursuant to applicable state law.

5. Servicer shall not order the securing of a property if the occupant or mortgagor has informed Servicer that the property is occupied or is being regularly maintained, unless Servicer obtains information subsequent to being informed that the property is being occupied or regularly maintained, causing Servicer to reasonably believe the property is now vacant or not being maintained. Servicer must document information causing Servicer to reasonably believe the property is now vacant or not being maintained.

6. Servicer shall not order a secure where its records indicate recent consumer communication that is inconsistent with vacancy, unless Servicer obtains information causing Servicer to reasonably believe the property has been vacant. Servicer must document any information causing Servicer to reasonably believe the property has been vacant. If the borrower has indicated within the past 30 days that he or she intends to maintain the property, including during the period between inspections, then Servicer must promptly notify the inspector (defined in paragraph II.H.1) of such findings and direct the inspector that no further property preservation activity shall occur at the property until Servicer has determined that the property is vacant based on an understanding of the facts that would resolve the conflict and would reasonably support a finding of vacancy. Servicer shall document in its records or its vendor's records its understanding of the facts that would resolve the conflict and reasonably supports a finding of vacancy.

7. Servicer must comply with the following obligations and must obligate third parties who perform property preservations services on its behalf to follow these obligations by including these obligations in its contracts for property preservation services. These obligations shall apply to pre-REO properties:

a. Servicer shall only secure property that it reasonably believes is vacant or is in unsecure condition based on at least two independent external inspections of the property, and Servicer may only enter and secure the property if the second inspection confirms that the factors demonstrating the property is vacant persist, unless Servicer obtains information causing Servicer to reasonably believe that waiting for a second inspection is likely to result in substantial harm to the property. Servicer must document any information causing Servicer to reasonably believe that waiting for a second inspection is likely to result in substantial harm to the property.

b. When Servicer determines that a property is vacant, Servicer must affix a notice on the front door of the property (1) advising the occupant that Servicer has determined that the property is vacant, (2) stating the date of the inspection(s), (3) advising the occupant to call a 24-hour toll-free telephone number if that determination is incorrect, and (4) advising that Servicer may secure the property in three days unless the occupant contacts Servicer, or if notice follows the second inspection, advise the occupant that the property has been secured and that the occupant should call the 24-hour telephone number if the occupant is still residing in the property or has personal property in the property. This notice must include a statement in Spanish directing the occupant to call the inspector's 24-hour toll-free telephone number to report that the property is not abandoned or for more information.

c. A determination that the property is vacant must be based on the good faith judgment of the inspectors, supported by objective factors which are documented by each inspector with date and time-stamped photographs, and a declaration of each inspector attesting to the factors giving rise to the determination. A drive-by inspection where the inspector does not exit his or her vehicle shall not constitute good faith, except in circumstances requiring no physical contact for personal safety reasons that are documented in Servicer's records or Servicer's vendor's records.

d. Servicer shall not consider a property vacant if:

  i. The occupant or mortgagor tells Servicer that the property is occupied or is being regularly maintained; provided that an occupant's or mortgagor's prior assertion that a property is being maintained will not prevent a property from being deemed vacant if, after such assertion is made, Servicer observes factors consistent with vacancy, and Servicer follows the procedures set forth in this Agreement; or

  ii. The property contains such personal belongings that a reasonable person could not have determined the property to

be vacant, unless the occupant or mortgagor has informed Servicer that the property is vacant.

e. Servicer shall require its property inspectors to record calls made to the 24-hour toll-free telephone number (unless prohibited by law) and to retain the recordings for a period of at least three years, along with any notes or other documentation relating to those calls.

f. Servicer must ensure that inspectors have access to or are otherwise informed of any recent communication from an occupant of the property that may be inconsistent with vacancy.

g. If Servicer secures a vacant or abandoned property, Servicer must promptly comply with any applicable law requiring registration of vacant or abandoned property.

h. Servicer shall not winterize a property unless winterizing is reasonably necessary at the time of the secure to protect the property or is required by GSE or FHA guidelines.

i. If an occupant notifies Servicer that the occupant has been locked out of the property, Servicer must make reasonable efforts to restore the occupant to exclusive access to the property within 24 hours. Servicer shall document in its records or its vendor's records the reasonable efforts undertaken to restore the occupant with exclusive access to the property.

j. If an occupant contacts Servicer about a utility shut-off caused by Servicer, Servicer must make reasonable efforts to cause utility service to be restored within 24 hours. Servicer shall document in its records or its vendor's records the reasonable efforts undertaken to restore the occupant's utility services within 24 hours.

k. If Servicer has removed personal property and an occupant subsequently requests the return of the personal property, Servicer shall return the personal property within three days, if the property is in Servicer's or its inspector's possession. If Servicer no longer has the personal property, Servicer shall reimburse the occupant for the reasonable replacement value of the personal property within 30 days of receipt of evidence reasonable to substantiate the personal property claimed. Servicer may request, but shall not require the occupant to provide photographs or receipts for the missing personal property, though Servicer may request that the occupant provide a list itemizing and valuing the missing property, along with an affidavit. Nothing in this paragraph shall obligate Servicer to reimburse the occupant if Servicer was authorized to remove the personal property by a court order or other applicable law, or if Servicer removed the personal property because it was directly causing a health or infestation risk that Servicer has documented with photographs.

l. Servicer shall not incentivize inspectors to deem a property vacant when, in fact, the property is occupied. Nor shall Servicer incentivize or prioritize speed over accuracy in making vacancy determinations or securing property.

m. Servicer shall not penalize or disincentivize inspectors from determining that a property is not vacant. Determining that a property is not vacant shall be given the same score or weight as determining that a property is vacant for the purpose of evaluating performance and assigning priority for future work orders.

n. Servicer shall provide inspectors with a unique lock box code for each property to be secured.

o. Servicer shall implement written policies and procedures that prohibit inspectors from harassing occupants, threatening occupants with dispossession, or otherwise violating the applicable law relating to the property rights of occupants. Servicer must require that inspectors are trained in these policies and procedures, and Servicer must require that inspectors are trained in the applicable law relating to the property rights of occupants. Servicer shall or shall cause any property preservation vendor to take appropriate disciplinary action, including termination, if an inspector violates these policies or procedures. Servicer shall require that the training described in this paragraph shall occur upon hire of the inspector and shall be repeated no less than annually.

p. Credible consumer complaints and the accuracy of vacancy determinations shall factor into Servicer's evaluation of inspectors and any other tool that determines the amount, frequency, or priority of future work orders. Servicer shall maintain in its records the score cards and other tools used to evaluate inspectors, including records relating to the consumer complaints and the accuracy of vacancy determinations that factored into each evaluation. Servicer shall evaluate inspectors in accordance with this paragraph on at least a monthly basis.

q. Servicer shall implement written policies and procedures that prohibit inspectors from harassing tenants, threatening tenants with dispossession, or otherwise violating the applicable law relating to the property rights of tenants. Servicer must require that inspectors are trained in these policies and procedures, and Servicer must require that inspectors are trained in the applicable law relating to the property rights of tenants. Servicer shall take or cause its property preservation vendor to take appropriate disciplinary action, including termination, if an inspector violates these policies or procedures. Servicer shall not secure property that is occupied by tenants, and the obligations of Servicer with respect to "occupants" as described in this paragraph (II.H) shall apply to tenants. Servicer

shall require that the training described in this paragraph shall occur upon hire of the inspector and shall be repeated no less than annually.

8. For REO properties, Servicer must comply with the following obligations:

a. Once a property changes from a pre-REO status to a REO status, Servicer shall not remove any personal property except where permitted by law.

b. Servicer shall make reasonable efforts to determine whether the property is occupied by tenants. Servicer must document the reasonable efforts undertaken to make this determination. Servicer shall not secure or remove personal property from a property that is occupied by tenants unless and until Servicer has obtained an order of possession against the tenants, or the securing, eviction, or removal of personal property is otherwise authorized by law.

c. Servicer shall implement written policies and procedures that prohibit inspectors (including, but not limited to, real estate agents or any other representative used with respect to REO property) from harassing tenants, threatening tenants with dispossession, or otherwise violating the applicable law relating to the property rights of tenants. Servicer must ensure that inspectors are trained in these policies and procedures, and Servicer must ensure that inspectors are trained in the applicable law relating to the property rights of tenants. Servicer shall take or shall cause its property preservation vendor to take appropriate disciplinary action, including termination, if an inspector violates these policies or procedures. Servicer shall require that the training described in this paragraph shall occur upon hire of the inspector and shall be repeated no less than annually.

## III. LOSS MITIGATION.

These requirements are intended to apply to both government-sponsored and proprietary loss mitigation programs and shall apply to subservicers performing loss mitigation services on Servicer's behalf. Loss mitigation application means an oral or written request for a loss mitigation option that is accompanied by any information required by the Servicer for evaluation for a loss mitigation option. Loss mitigation option means an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the Servicer to the borrower.

A. Loan Modification Requirements.

1. Servicer shall offer and facilitate loan modifications for borrowers rather than initiate foreclosure when such loan modifications for which they are eligible meet investor, guarantor, insurer, and program requirements.

2. Servicer shall, after receiving the final trial period payment, promptly send by written means a final modification agreement to borrowers who have enrolled in a trial period plan and who have made the required number of

timely trial period payments, where the modification is underwritten prior to the trial period and has received any necessary investor, guarantor, or insurer approvals. The borrower shall then be converted by Servicer to a permanent modification upon execution of the final modification documents, consistent with applicable program guidelines, absent evidence of fraud.

3. Servicer shall ensure that a borrower's permanent modification principal and interest payment is substantially the same as the borrower's trial period principal and interest payment, except in limited instances in which the payment change is reasonable and warranted to permit the permanent modification to proceed.

B. Dual Track Restricted.

1. If, after an eligible borrower has been referred to foreclosure, Servicer receives a complete loss mitigation application (as defined by paragraph III.F.1) from the borrower more than 37 days before a scheduled foreclosure sale, then while such loss mitigation application is pending, Servicer shall not move for foreclosure judgment or order of sale (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or conduct a foreclosure sale. If Servicer offers the borrower a loan modification based on that application, Servicer shall not move for judgment or order of sale (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or seek a foreclosure sale until the earlier of (a) 14 days after the date of the related offer of a loan modification; or (b) the date the borrower declines the loan modification offer. If the borrower accepts the loan modification offer within 14 days after the date of the related offer of loan modification, Servicer shall continue this delay until the borrower fails to perform under the loss mitigation agreement.

2. If the loan modification requested by a borrower described in paragraph III.B.1 is denied, then, except when otherwise required by federal or state law or investor directives, if borrower is entitled to an appeal under paragraph III.G, Servicer will not proceed to a foreclosure sale until the later of (if applicable):

a. Expiration of the 14-day appeal period; or

b. If the borrower appeals the denial, until the later of (if applicable) (i) if Servicer denies borrower's appeal, 15 days after the letter denying the appeal, (ii) if Servicer sends borrower a letter granting his or her appeal and offering a loan modification, 14 days after the date of such offer, (iii) if the borrower timely accepts the loan modification offer (verbally, in writing (including e-mail responses), or by making the first trial period payment), after the failure of Servicer timely to receive the first trial period payment, or (iv) if Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

3. If, after an eligible borrower has been referred to foreclosure, Servicer receives a complete loan modification application within 37 to 15 days before a scheduled foreclosure sale, then Servicer shall conduct an expedited review of the borrower's application and, if the borrower is extended a loan modification offer, Servicer shall postpone any foreclosure sale until the earlier of (a) 14 days after the date of the related evaluation notice; or (b) the date the borrower declines the loan modification offer. If the borrower timely accepts the loan modification offer based on that application, Servicer shall delay the foreclosure sale until the borrower fails to perform under the loss mitigation agreement.

4. If, after an eligible borrower has been referred to foreclosure, Servicer receives a complete loan modification application less than 15 days and more than 5 days before a scheduled foreclosure sale, Servicer must notify the borrower before the foreclosure sale date as to Servicer's determination (if its review was completed) or inability to complete its review of the loan modification application. If Servicer makes a loan modification offer to the borrower based on that application, then Servicer shall postpone any sale until the earlier of (a) 14 days after the date of the related evaluation notice; or (b) the date the borrower declines the loan modification offer. If the borrower timely accepts a loan modification offer based on that application, Servicer shall delay the foreclosure sale until the borrower fails to perform under the loss mitigation agreement.

5. For purposes of paragraph III.B.1, Servicer shall not be responsible for failing to obtain a delay in a ruling on a judgment, a motion for judgment, or a delay in foreclosure sale date, if Servicer made a request for such delay, pursuant to any state or local law, court rule, or customary practice, and such request was not approved. Notwithstanding the above, where Servicer or counsel retained by Servicer fails to make a request for a delay in ruling on a judgment or a motion for judgment pursuant to any state or local law, or customary practice, the Servicer must dismiss the foreclosure proceeding if necessary to avoid the sale.

6. Servicer shall not move to judgment or order of sale or proceed with a foreclosure sale under any of the following circumstances:

   a. The borrower is in compliance with the terms of a trial loan modification, forbearance, or repayment plan;

   b. The borrower has been approved by Servicer to participate in a short sale, the borrower has an offer, and the property is in an auction period; or

   c. A short sale or deed-in-lieu of foreclosure has been approved by all parties (including, for example, first lien investor, junior lien holder and mortgage insurer, as applicable).

7. If Servicer offers the borrower a loan modification that is not based upon receipt of a complete loan modification application submitted by the

borrower, Servicer shall not proceed with foreclosure sale until the time for the borrower to accept or reject the loan modification offer has expired, which in no event shall be less than 14 days.

8. In non-judicial foreclosures, if a foreclosure or trustee's sale is continued (rather than cancelled) to provide time to evaluate loss mitigation options, Servicer or Servicer's counsel shall promptly notify borrower by written means of the new date of sale.

9. Servicer shall ensure timely and accurate communication of or access to relevant loss mitigation status and changes in status to its foreclosure attorneys, bankruptcy attorneys, and foreclosure trustees and, where applicable, to court-mandated mediators.

C. Single Point of Contact.

1. Servicer shall establish an easily accessible and reliable single point of contact for each potentially-eligible first lien mortgage borrower so that the borrower has access to an employee of Servicer to communicate through verbal means throughout the loss mitigation, loan modification, and foreclosure processes. For purposes of this Agreement, single point of contact ("SPOC") means an individual who has the ability and authority to perform the responsibilities described in this paragraph (III.C).

2. Servicer shall identify the SPOC to the borrower within five business days after a potentially eligible borrower requests loss mitigation assistance by written means. Servicer shall provide one or more direct means of communication with the SPOC on loss mitigation-related correspondence with the borrower. Servicer shall within five business days provide updated contact information to the borrower if the designated SPOC is reassigned or no longer employed by Servicer, or otherwise not able to act as the primary point of contact.

3. The SPOC shall have primary responsibility for:

   a. Communicating the options available to the borrower, the actions the borrower must take to be considered for these options, and the status of Servicer's evaluation of the borrower for these options;

   b. Coordinating receipt of all documents associated with loan modification or loss mitigation activities;

   c. Being knowledgeable about the borrower's situation and current status in the delinquency/imminent default resolution process; and

   d. Ensuring that communications with borrowers are properly documented in Servicer's records, including sufficient information to identify the SPOC or representative who communicated with the borrower, and the date each communication took place.

4. The SPOC shall provide the following services to borrowers, as applicable:

a. Contact the borrower in writing and make a reasonable effort to speak to the borrower by telephone to introduce himself/herself as the borrower's SPOC, unless prohibited;

b. Explain programs for which the borrower is eligible;

c. Explain the requirements of the programs for which the borrower is eligible;

d. Explain program documentation requirements;

e. Provide basic information about the status of borrower's account, including pending loan modification applications, other loss mitigation alternatives, and foreclosure activity;

f. Notify borrower of missing documents and provide an address or electronic means for submission of documents by borrower in order to complete the loan modification application;

g. Communicate Servicer's decision regarding loan modification applications and other loss mitigation options to borrower in writing;

h. Inform the borrower about pursuing appropriate alternative non-foreclosure options upon the denial of a loan modification, and assist the borrower if he or she expresses interest in these options;

i. If a loan modification is approved, call and make a reasonable effort to speak with the borrower (unless prohibited) to explain the program;

j. Provide information regarding credit counseling where necessary;

k. Assist the borrower to clear any internal processing requirements;

l. Have access to individuals with the ability to stop foreclosure proceedings when necessary to comply this Agreement, or any other legal requirement; and

m. Inquire as to whether the borrower is occupying the property, and if not whether the borrower intends to maintain the property, and record a borrower's occupancy or intention to maintain the property in Servicer's records in order to inform the property inspection process.

5. The SPOC shall remain assigned to borrower's account and available to borrower until such time as Servicer determines in good faith that all loss mitigation options have been exhausted, borrower's account becomes current or, in the case of a borrower in bankruptcy, the borrower has exhausted all loss mitigation options for which the borrower is potentially eligible and has applied.

6. Servicer shall ensure that a SPOC can refer and transfer a borrower to an appropriate supervisor upon request of the borrower.

7. Servicer shall ensure that relevant records relating to borrower's account are promptly available to the borrower's SPOC, so that the SPOC can timely, adequately, and accurately inform the borrower of the current status of loss mitigation, loan modification, and foreclosure activities.

8. Servicer shall designate one or more management level employees to be the primary contact for the state Attorneys General, state financial regulators, and federal regulators for communication regarding complaints and inquiries from individual borrowers. Servicer shall provide a written acknowledgment to all such inquiries within five business days. Servicer shall provide a substantive written response to all such inquiries within the earlier of 30 days or the time frame prescribed in the complaint or inquiry. Servicer shall provide relevant loan information to borrower and to state Attorneys General, state financial regulators, and federal regulators upon written request and if properly authorized. A written complaint filed by a borrower and forwarded by a state Attorney General or financial regulatory agency to Servicer shall be deemed to have proper authorization.

D. Loss Mitigation Communications with Borrowers.

1. No later than the 36th day of delinquency, Servicer shall conduct affirmative outreach efforts to inform delinquent borrowers of loss mitigation options. Servicer shall disclose and provide accurate information to borrowers relating to the qualification process and eligibility factors for loss mitigation programs. The use by Servicer of nothing more than prerecorded automatic messages in loss mitigation communications with borrowers shall not be sufficient in those instances in which it fails to result in contact between the borrower and one of Servicer's loss mitigation specialists. The foregoing notwithstanding, Servicer is exempt from this requirement for borrowers who are debtors in bankruptcy under Title 11 of the United States Code.

2. Servicer shall communicate, at the written request of the borrower, with the borrower's authorized representatives, including housing counselors. Servicer shall communicate with representatives from state Attorneys General and financial regulatory agencies acting upon a written complaint filed by the borrower and forwarded by the state Attorney General or financial regulatory agency to Servicer. When responding to the borrower regarding such complaint, Servicer shall include the applicable state Attorney General or financial regulatory agency on all correspondence with the borrower regarding such complaint, unless otherwise requested by the government representative.

3. Servicer shall cease all collection efforts (including acceleration notices, notices of default, pre-foreclosure notices required by state law, and referrals to foreclosure) while the borrower is making timely payments under a trial loan modification, and will cease collection calls when a borrower has submitted a complete loan modification application, and a modification decision is pending. While a borrower is making timely trial loan modification payments or while a modification decision is pending,

Servicer may send the borrower monthly billing statements, certain loss mitigation solicitation letters (in circumstances in which an alternate loss mitigation option becomes available and the alternate option may be appropriate for the borrower), and other notices required by investors and by state and federal law (except as prohibited above), and Servicer may contact the borrower to gather required loss mitigation documentation or to assist the borrower with performance under a trial loan modification plan (including outbound calls by a SPOC).

4. As indicated in paragraph I.A.8, Servicer (including any attorney or trustee conducting foreclosure proceedings at the direction of Servicer) shall send a written communication to the borrower that includes clear language that:

   a. In some instances the borrower may still be able to be evaluated for alternatives to foreclosure by submitting a loss mitigation application to Servicer; and

   b. Provides Servicer's contact information for requesting a loss mitigation application package and for submitting a complete loss mitigation application, including Servicer's toll-free telephone number.

E. Development of Loan Portals for use by Qualified Housing Counseling Agencies.

1. Servicer shall have an online portal for communication with qualified housing counseling agencies working on behalf of borrowers.

2. Servicer shall have a portal that will, among other things:

   a. Enable documents to be submitted electronically;

   b. Provide a response that documents submitted were received;

   c. Provide information and eligibility factors for proprietary loan modification and other loss mitigation programs; and

   d. Permit Servicer to communicate with qualified housing counselors on behalf of borrowers to satisfy any written communications required to be provided by Servicer, if borrower documents have been submitted electronically by a qualified housing counselor.

3. Servicer shall update the status of each pending loan modification on these portals at least every 10 business days and ensure that each portal is updated on such a schedule as to maintain consistency.

F. Loss Mitigation Timelines.

1. If Servicer receives a partial loss mitigation application from the borrower more than 37 days before a scheduled foreclosure sale, Servicer shall notify the borrower in writing of any known deficiency in the borrower's loss mitigation application, no later than five business days after receipt, including any missing information or documentation required for the loss mitigation application to be considered complete.

2. If Servicer receives a partial loss mitigation application from the borrower more than 15 days but 37 days or fewer before a scheduled foreclosure sale, Servicer shall use best efforts to notify the borrower of any known deficiency in the borrower's loss mitigation application, including any missing information or documentation required for the loss mitigation application to be considered complete.

3. For purposes of this Agreement, a complete loss mitigation application means an application in connection with which Servicer has received all the information that Servicer requires from the borrower in evaluating applications for the loss mitigation options available to the borrower. Servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

4. Subject to III.B, whenever Servicer notifies the borrower in writing of any deficiency in a loss mitigation application, Servicer shall afford borrower 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination on whether or not to offer a loss mitigation option. Notwithstanding the above, Servicer may afford borrower less than 30 days if foreclosure, referral, judgment, or sale is scheduled to occur within 30 days. In these cases, Servicer must include a reasonable date by which the borrower must submit the documents and information necessary to make the loss mitigation application complete. A reasonable date must never be less than seven days from the date on which Servicer provides the written notice.

5. Within five business days of receiving a borrower's complete loss mitigation application, Servicer shall notify the borrower by written means when a loss mitigation application is complete. The notice of complete application must inform the borrower the date Servicer received the complete application. This provision shall not apply to loss mitigation applications received within 15 days of the foreclosure sale date.

6. Subject to III.B, Servicer shall review the complete loss mitigation application submitted by borrower and shall determine the disposition of borrower's loss mitigation application no later than 30 days after receipt of the complete loss mitigation application.

7. Subject to III.B, Servicer shall provide the borrower with an approval notice in writing stating Servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage within 30 days of receiving the borrower's complete loss mitigation application.

8. Except when evaluated as provided in paragraphs III.B.3 or III.B.4, Servicer's denial of an eligible borrower's request for a first lien loan modification following the submission of a complete loan modification application shall be subject to an independent evaluation. Such evaluation

shall be performed by an independent entity or a different employee who has not been involved with the particular loan modification.

9. Subject to III.B, when a loss mitigation application is denied (after the independent evaluation in paragraph III.F.6 of this Agreement is performed), Servicer shall send a written non-approval notice to the borrower within 30 days of receiving the borrowers complete loss mitigation application. Servicer shall identify in this non-approval notice the reasons for denial and the factual information considered. The notice shall further inform a borrower that is eligible to appeal the decision, pursuant to paragraph III.G.1 of this Agreement, that he or she has 14 days from the date of the written non-approval notice to provide evidence that the eligibility determination was in error. If a loan modification application is denied because it is disallowed by an investor, Servicer shall disclose in the written non-approval notice the name of the investor and summarize the reasons for the investor's denial. For those cases where a loan modification application denial is the result of a loan-to-value ("LTV") calculation, Servicer shall provide in the written non-approval notice the monthly gross income and property value used in the calculation.

10. Servicer shall allow properly submitted borrower financials to be used for 90 days from the date on the documents, unless Servicer learns that there has been a material change in financial circumstances or unless investor requirements mandate a shorter time frame.

11. Servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless a borrower's mortgage loan obligation is more than 120 days delinquent. Notwithstanding this requirement, Servicer may initiate foreclosure when a borrower has abandoned or surrendered the property.

G. Appeal Process.

1. After the mandatory review in paragraph III.F.8 has been completed and Servicer has issued the written non-approval notice, borrowers shall have 14 days to request an appeal and obtain an independent review of the loan modification denial in accordance with the terms of this Agreement. Servicer shall document a borrower's request for an appeal in its records. Servicer shall further ensure that the borrower has 14 days from the date of the written non-approval notice to provide information as to why Servicer's denial of the loan modification application was in error.

2. For those cases in which the first lien loan modification denial is the result of an LTV calculation, the written non-approval notice must advise the borrower that if a borrower disagrees with the property value used by Servicer in the LTV test, the borrower can request (within 14 days of the denial notice) that Servicer obtain a full appraisal of the property by an independent licensed appraiser at the borrower's expense. Servicer shall document a borrower's request of a full appraisal of the property by an independent licensed appraiser in its system of record, and may require the

borrower to pay for the appraisal in advance. Upon receipt of the appraisal, Servicer must perform a final LTV re-evaluation using the appraised value and any other LTV input values materially disputed by the borrower. Servicer must provide the final LTV outcome and input values to the borrower in the final disposition letters described in paragraphs III.G.3 and III.G.4, below.

3. Servicer shall review the information submitted by borrower and use its best efforts to communicate the disposition of borrower's appeal to borrower by written means no later than 30 days after receipt of the information.

4. If Servicer denies borrower's appeal, Servicer's appeal denial letter shall include a description of other available loss mitigation options, including, but not limited to, short sales and deeds in lieu of foreclosure.

H. General Loss Mitigation Requirements.

1. Servicer shall maintain adequate staffing and systems for tracking borrower documents and information that are relevant to foreclosure, loss mitigation, and other Servicer operations. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate.

2. Servicer shall maintain adequate staffing and caseload limits for SPOCs and employees responsible for handling foreclosure, loss mitigation, and related communications with borrowers and housing counselors. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate.

3. Servicer shall establish reasonable minimum experience, educational, and training requirements for loss mitigation staff.

4. Servicer shall document electronically key actions taken on a foreclosure, loan modification, or other loss mitigation relief, bankruptcy, or other servicing file, including communications with the borrower.

5. Servicer shall not adopt compensation arrangements for its employees that encourage foreclosure over loss mitigation alternatives.

6. Servicer shall not make inaccurate payment delinquency reports to credit reporting agencies when the borrower is making timely reduced payments pursuant to a trial or other loan modification agreement. Servicer shall provide the borrower, prior to entering into a trial loan modification, with clear and conspicuous written information that adverse credit reporting consequences may result from the borrower making reduced payments during the trial period.

7. Servicer shall ensure that all loan modifications be in writing. Where Servicer grants a loan modification, Servicer shall provide borrower with a copy of the fully executed loan modification agreement within 45 days of receipt of the executed copy from the borrower. Servicer shall not instruct, advise, or recommend that borrowers go into default in order to qualify for loss mitigation relief.

8. Servicer shall not discourage borrowers from working or communicating with legitimate non-profit housing counseling services.

9. Servicer shall not, in the ordinary course, require a borrower to waive or release claims and defenses as a condition of approval for a loan modification program or other loss mitigation relief. However, nothing herein shall preclude Servicer from requiring a waiver or release of claims and defenses with respect to a loan modification offered in connection with the resolution of a contested claim, when the borrower would not otherwise be qualified for the loan modification under existing Servicer programs.

10. Servicer shall not charge a borrower an application fee in connection with a request for a loan modification. Servicer shall provide the borrower with a means to submit a loan modification application free of charge.

11. Notwithstanding any other provision of this Agreement, and to minimize the risk of borrowers submitting multiple loss mitigation requests for the purpose of delay, Servicer shall not be obligated to evaluate requests for loss mitigation options if the borrower has not been current on his or her loan at any time since submitting a prior complete loss mitigation application, provided that Servicer previously complied with the requirements of 12 C.F.R. § 1024.41 in evaluating the previous application submitted by the borrower. Servicer's evaluation of a borrower for a loan modification program that was not based on evaluation of a complete loss mitigation application submitted by the borrower shall not constitute a previous evaluation for the purposes of this paragraph.

12. A borrower's prior chapter 7 discharge should not impact his or her eligibility for loss mitigation.

13. Successors in Interest.

    a. For purposes of this paragraph (III.H.13), Successor in Interest means a person to whom an ownership interest in a property securing a mortgage loan subject to this Agreement is transferred from a borrower, provided that the transfer is:

        i. A transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety;

        ii. A transfer to a relative resulting from the death of a borrower;

        iii. A transfer where the spouse or children of the borrower become an owner of the property;

        iv. A transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the borrower becomes an owner of the property; or

        v. A transfer into an inter vivos trust in which the borrower is and remains a beneficiary and which does not relate to a transfer of rights of occupancy in the property.

b. All of the mortgage servicing standards in this Agreement shall apply to Confirmed Successors in Interest. For purposes of this paragraph (III.H.13), a Confirmed Successor in Interest means a Successor in Interest once the Servicer has confirmed the Successor in Interest's identity and ownership interest in a property that secures a mortgage loan subject to this Agreement.

c. Servicer shall implement policies and procedures that are reasonably designed to ensure Servicer can promptly identify and facilitate communications with a potential Successor in Interest upon notification of the death of a borrower or another transfer of a property securing a mortgage loan.

d. Upon receipt of a loss mitigation application from a potential Successor in Interest or a written request from a potential Successor in Interest that includes the name of the prior borrower and information that enables Servicer to identify the borrower's mortgage loan account, Servicer shall promptly send a written notice to the potential Successor in Interest with a description of the documents Servicer requires in order to confirm that the requestor is a Successor in Interest in the property.

e. Servicer's request for documentation shall be reasonable and shall be tailored to the specific type of transfer that gives rise to the Successor in Interest's ownership interest.

f. Upon receipt of all documents requested by Servicer, Servicer shall send a written notice confirming or denying the requestor's status as a Successor in Interest or identifying any additional documents that are required within 10 business days.

g. Servicer may condition the offer of a loan modification to a Confirmed Successor in Interest upon assumption of the loan.

14. Servicer shall treat government benefits as a legitimate source of income for the purposes of evaluating borrowers for loan modification options and shall not require additional information regarding the manner in which the government benefits are used by borrowers.

I. Proprietary Loan Modifications.

1. Servicer shall make the following information available on a publicly-accessible website:

a. Information on its qualification processes for a loan modification;

b. Required documentation for a loan modification;

c. Information necessary for a complete loan modification application; and

d. Key eligibility factors for loan modifications.

2. Servicer shall design proprietary loan modification programs that are intended to help defaulted customers remain in their homes, subject to investor guidelines.

3. Servicer shall design these programs with the intent of providing sustainable and affordable monthly payments for borrowers needing long term or permanent assistance.

4. If Servicer capitalizes any arrearages, fees, or costs as part of a proprietary loan modification offer, Servicer shall send the borrower simultaneous with the trial plan the categories and estimated amounts of the capitalized arrearages, fees, and costs. Servicer may indicate that the estimated amounts may change between the trial plan and the permanent modification offer.

5. Servicer shall track outcomes and maintain records regarding characteristics and performance of proprietary first lien loan modifications.

6. Servicer shall not charge any application or processing fees for proprietary first lien loan modifications.

7. Servicer shall not demand a lump sum payment as a prerequisite to evaluation for, or the granting of, a proprietary loan modification, unless specifically required by investor guidelines.

J. Short Sales.

1. General Provisions.

a. Servicer shall make publicly available information on general requirements for the short sale process.

b. Servicer shall consider appropriate monetary incentives to underwater borrowers to facilitate short sale options.

c. Servicer shall assist a borrower who is interested in a short sale to list their property and begin the short sale evaluation process.

d. When Servicer receives a short sale application, Servicer shall send a notice to the borrower within 30 days of receiving the short sale application that includes basic information about the short sale process, states that Servicer will waive any deficiency amount resulting from a short sale and will not sell any deficiency amount to a third party, subject to investor requirements, and that the borrower should consult his or her tax advisor regarding possible tax consequences.

e. If the short sale request is accepted, Servicer shall contemporaneously notify the borrower whether a deficiency payment or related cash contribution will be required and the approximate amount of that deficiency, if such deficiency obligation is permitted by applicable law.

f. If Servicer waives a deficiency claim, it shall not sell or transfer such claim to a third-party debt collector or debt buyer for collection.

g. If the short sale request is denied, Servicer shall provide reasons for the denial in the written notice.

2. Provisions Related to the Use of Auction Websites for Short Sales.

a. Servicer shall inform borrowers in the short sale process about specific requirements related to the use of auction websites for short sales, including:

i. Whether the use of an auction website for short sales is required or optional for the loans which are eligible for the auction program; and

ii. A description of the auction process, including:

(a) The maximum length of time during which the property will be listed on an auction website;

(b) A breakdown of all fees charged by either Servicer or its third party provider during the auction process, including a breakout of which party to the transaction is required to pay the fee and the circumstances, if any, under which a fee will be waived; and

(c) A description of how participation in the program may impact a borrower's eligibility for other loss mitigation options such as a traditional short sale or deed in lieu of foreclosure.

b. Where the borrower has submitted a short sale offer to Servicer, Servicer must conclude its evaluation of the short sale offer within 30 days of receiving all information from the borrower needed to evaluate the offer. Servicer's decision to list the property on an auction website subsequent to its receipt of an offer submitted by the borrower shall not extend Servicer's obligation to timely conclude its evaluation of the short sale offer submitted by the borrower.

c. Servicer shall permit the borrower to remove the property from Servicer's selected auction program website for any reason and at any time without cost to the borrower.

d. A borrower's decision to remove the property from the auction program shall not impact the borrower's eligibility for loss mitigation options other than short sale.

e. If the auction does not result in a short sale, Servicer shall continue to evaluate the borrower for a traditional short sale; and

f. For borrowers that are required to list their property at an auction website, Servicer shall waive inspection fees and late fees that accrue during the pendency of the auction program.

K. Transfer of Servicing of Loans.

1. This paragraph (III.K) shall apply to all sales or transfers of servicing, including subservicing.

2. Ordinary Transfer of Servicing from Servicer to Successor Servicer or Subservicer.

   a. At the time of transfer or sale, Servicer shall inform the successor servicer whether a loss mitigation application is pending.

   b. Any contract for the transfer or sale of servicing rights entered into by Servicer shall obligate the successor servicer to accept and continue processing pending loss mitigation applications.

   c. Any contract for the transfer or sale of servicing rights entered into by Servicer shall obligate the successor servicer to honor trial and permanent loan modification agreements or other types of loss mitigation agreements entered into by the prior servicer.

3. Transfer of Servicing to Servicer.

   a. Servicer must accept and continue to process pending loss mitigation applications from the prior servicer.

      i. Servicer must process pending loss mitigation applications upon the same time frames that applied to the transferor servicer prior to the transfer, except in the following situations:

         (a) If the transferor servicer received a loss mitigation application but had not yet sent the borrower a letter either confirming that the application is complete or identifying missing documents or information, Servicer must send such a letter within 10 days of the transfer date.

         (b) If the transferor servicer received a complete loss mitigation application but had not yet completed its evaluation, Servicer must complete the loss mitigation evaluation within 30 days of the transfer date.

      ii. Servicer may not attempt to obtain from the borrower any missing information or documents that were previously submitted by the borrower to the transferor servicer, without first contacting the transferor servicer to attempt to obtain the missing information or documents.

      iii. If the transferor servicer denied the loss mitigation application prior to the transfer, Servicer must ensure that the borrower receives 14 days to appeal the denial before taking any adverse action against the borrower. If there is a

pending appeal at the time of the transfer, or if an appeal is made after the transfer date, the Servicer must make a determination within 30 days of the transfer date or within 30 days of the date the borrower made the appeal, whichever is later. If Servicer is unable to make a determination as to the appeal, Servicer must treat the borrower's application as a pending complete application and evaluate it within 30 days of the transfer date or within 30 days of the date the borrower made the appeal, whichever is later.

iv. Where Servicer identifies documents or information indicating that a loss mitigation application was pending on a loan within 60 days of transfer, including where loan file data indicates that such an application was pending, or where a borrower indicates the same, and Servicer lacks clear written evidence of a loss mitigation denial by the transferor servicer, Servicer shall take all reasonable steps to obtain documents that may not have been transferred or confirmation from the transferor servicer concerning the status of any loss mitigation activity or review of a loss mitigation request and shall:

(a) Where the transferor servicer's review was not complete, complete the review of the borrower's prior loss mitigation request, after notifying the borrower of any necessary information missing from such application, and afford the borrower an opportunity to have the loss mitigation request reviewed through the independent evaluation and appeal process under paragraphs III.F.6 and III.G; or

(b) Provide the borrower a written denial notice, in compliance with paragraph III.F.7, and provide the borrower 14 days to request an appeal of a loan modification denial under paragraph III.G.

b. Servicer must honor trial and permanent loan modification agreements entered into by the prior servicer.

i. If the transferor servicer extended a trial or permanent loan modification offer to the borrower, Servicer must ensure that the borrower has had at least 14 days to accept or reject the offer before taking any adverse action against the borrower.

ii. If Servicer does not have evidence of a loan modification offer or agreement from the transferring servicer, but the borrower provides a copy of a loan modification offer or agreement, and the borrower has complied in good faith with the terms of that offer or agreement, that shall be deemed evidence of a loan modification offer or agreement. A

borrower making payments that conform to the payment terms of the offer shall be deemed to be the borrower's good faith compliance with the terms of the offer or agreement. However, if Servicer reasonably suspects potential fraud on the part of the borrower or their authorized agent, it may perform additional due diligence to confirm the validity of the loan modification offer or agreement, which shall include, but is not limited to, reasonable diligence in contacting the prior servicer before agreeing to honor the offer or agreement.

iii. Servicer must ensure that trial period payments, including those received by the prior servicer, are applied in accordance with the trial period plan.

iv. Servicer must ensure that post-modification payments, including those received by the prior servicer, are applied in accordance with the modified loan documents.

c. Within 15 days after the transfer, Servicer must send a written notice to the borrower that contains the following items:

i. The effective date of transfer of the servicing;

ii. The name, address, and a collect call or toll-free telephone number for an employee or department of the transferee servicer that can be contacted by the borrower to obtain answers to servicing transfer inquiries;

iii. The name, address, and a collect call or toll-free telephone number for an employee or department of the transferor servicer that can be contacted by the borrower to answer inquiries relating to the transfer of servicing;

iv. The date on which the transferor servicer will cease to accept payments relating to the loan and the date on which the transferee servicer will begin to accept such payments. These dates shall either be the same or consecutive days;

v. Whether the transfer will affect the terms or the continued availability of mortgage life or disability insurance, or any other type of optional insurance, and any action the borrower must take to maintain such coverage;

vi. A statement that the servicing transfer does not affect any term or condition of the security instrument other than terms directly related to the servicing of such loan;

vii. A statement as to whether the loan was current or delinquent at transfer according to the records received by Servicer, the date for which the loan is due, and the total amount of the unpaid principal balance;

viii. If there is an escrow account, Servicer must provide the escrow account balance according to the records received by Servicer;

ix. If there is a suspense account, Servicer must provide a brief explanation of what a suspense account is, and Servicer must provide the suspense account balance;

x. If Servicer is aware that there is a pending loss mitigation application or pending trial plan, Servicer must acknowledge that there is a pending application, that a review for a permanent payment solution is in process, and that Servicer will contact the borrower within 30 days of transfer; and

xi. A notice that if there is a pending trial plan, the borrower must continue to make trial modification payments addressed to Servicer.

d. For the 60 days before and after the date of the transfer of servicing of any mortgage loan, if the transferor servicer (rather than the transferee Servicer that should properly receive payment on the loan) received payment on or before the applicable due date (including any grace period allowed under the mortgage loan instruments), a payment may not be treated as late for any purpose.

i. Servicer shall not charge or collect a late fee for any such payment.

ii. Servicer must report any such payment as a timely made payment to credit reporting agencies, and Servicer shall not provide any adverse information about any such payment to credit reporting agencies.

e. Servicer shall not commence, refer to, or proceed with foreclosure until Servicer has satisfied all requirements under paragraphs III.K.3.a and III.K.3.b.

## IV. PROTECTIONS FOR MILITARY PERSONNEL.

A. When a borrower states that he or she is or was within the preceding one year (or the then applicable statutory period under the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. § 3901 *et seq.*) in active military service or has received and is subject to military orders requiring him or her to commence active military service, Servicer shall continue to determine whether the borrower may be eligible for the protections of the SCRA or for the protections of the provisions of paragraph IV.E. If Servicer determines the borrower is so eligible, Servicer shall continue to, until Servicer determines that such borrower is no longer protected by the SCRA,

1. If such borrower is not entitled to a SPOC, route such borrowers to employees who have been specially trained about the protections of the SCRA to respond to such borrower's questions; or

2. If such borrower is entitled to a SPOC, designate as a SPOC for such borrower a person who has been specially trained about the protections of the SCRA (Servicemember SPOC).

B. Servicer shall continue to, in addition to any other reviews it may perform to assess eligibility under the SCRA, (i) before referring a loan for foreclosure, (ii) within seven days before a foreclosure sale, and (iii) the later of (A) promptly after a foreclosure sale and (B) within three days before the regularly scheduled end of any redemption period, determine whether the secured property is owned by a servicemember covered under SCRA by searching the Defense Manpower Data Center (DMDC) for evidence of SCRA eligibility by either (a) last name and social security number, or (b) last name and date of birth.

C. When a servicemember provides written notice of eligibility for interest rate relief under the SCRA, but does not provide the military orders required by 50 U.S.C. § 3937(b)(1), Servicer shall continue to accept, in lieu of the documentation required by 50 U.S.C. § 3937(b)(1), a letter on official letterhead from the servicemember's commanding officer that includes contact information for confirmation:

1. Setting forth the full name and Social Security number or date of birth of the servicemember; and

2. Setting forth the period of military service of the servicemember and, as may be applicable, that the military service of the servicemember is indefinite or the date on which the military service of the servicemember ended or is scheduled to end.

In the event that a servicemember provides written notice of eligibility for interest rate relief under the SCRA but fails to provide either (a) a copy of military orders required by 50 U.S.C. § 3937(b)(1), or (b) a letter with the content described above, Servicer shall search the DMDC to confirm eligibility. If the DMDC records provide dates of service that confirm eligibility, Servicer shall provide the relief required by the SCRA for the dates indicated by the DMDC and shall notify the servicemember that the servicemember may submit additional documentation to establish eligibility dates if the servicemember disagrees with the dates provided by the DMDC. If the DMDC records do not confirm eligibility, Servicer may deny the relief if it informs the servicemember that he or she is not eligible for the relief unless he or she provides a copy of documents establishing military service.

D. Servicer shall continue to notify borrowers who are 45 days delinquent that, if they are a servicemember, (a) they may be entitled to certain protections under the SCRA regarding the servicemember's interest rate and the risk of foreclosure, and (b) counseling for covered servicemembers is available at agencies such as Military OneSource, Armed Forces Legal Assistance, and a HUD-certified housing counselor. Such notice shall include a toll-free telephone number that servicemembers may call to be connected to a person who has been specially trained about the protections of the SCRA to respond to such borrower's questions. Such telephone number shall either connect directly to such a person or afford a caller the ability to identify him- or herself as an eligible servicemember and be routed to such persons. Servicer hereby confirms that it takes reasonable steps to

ensure the dissemination of such toll-free number to borrowers who may be eligible servicemembers.

E. Servicer shall continue not to require a servicemember to be delinquent to qualify for a short sale, loan modification, or other loss mitigation relief if the servicemember is suffering financial hardship and is otherwise eligible for such loss mitigation. Subject to Applicable Requirements, for purposes of assessing financial hardship in relation to (i) a short sale or deed in lieu transaction, Servicer will continue to take into account whether the servicemember is, as a result of a permanent change of station order, required to relocate even if such servicemember's income has not been decreased, so long as the servicemember does not have sufficient liquid assets to make his or her monthly mortgage payments, or (ii) a loan modification, Servicer will continue to take into account whether the servicemember is, as a result of his or her military orders, required to relocate to a new duty station at least seventy five mile from his or her residence/secured property or to reside at a location other than the residence/secured property, and accordingly is unable personally to occupy the residence and (a) the residence will continue to be occupied by his or her dependents, or (b) the residence is the only residential property owned by the servicemember.

F. Servicer shall continue to make accurate reports to credit reporting agencies when a servicemember, who has not defaulted before relocating under military orders to a new duty station, obtains a short sale, loan modification, or other loss mitigation relief.

G. Transfer of Servicing of Loans.

1. This paragraph (IV.G) shall apply to all sales or transfers of servicing, including subservicing. Ordinary Transfer of Servicing from Servicer to Successor Servicer or Subservicer.

a. At the time of transfer or sale, Servicer shall inform the successor servicer whether the borrower has been granted SCRA protections or a written notice of eligibility for interest rate relief under the SCRA has been submitted.

2. Transfer of Servicing to Servicer.

a. Servicer must accept and continue to process written notices of eligibility for interest rate relief under the SCRA that had been submitted to the prior servicer.

i. Servicer may not attempt to obtain from the borrower any missing information or documents that were previously submitted by the borrower to the transferor servicer, without first contacting the transferor servicer to attempt to obtain the missing information or documents.

## V. RESTRICTIONS ON SERVICING FEES.

A. General Fee Provisions.

1. Servicer shall not charge any fee or cost to the borrower unless the charge is bona fide, reasonable, actually incurred, and disclosed to the borrower. For purposes of this section, a fee or cost is disclosed to the borrower if it is set forth on a monthly billing statement.

2. Schedule of Fees. Servicer shall maintain and keep current a schedule of common state specific and non-state specific fees or ranges of fees that may be charged to borrowers by or on behalf of Servicer. Servicer shall make this schedule available on its website and to the borrower or borrower's authorized representative upon request. The schedule shall identify each fee, provide a plain language explanation of the fee, and state the maximum amount of the fee or how the fee is calculated or determined.

3. If a borrower or the borrower's representative requests a payment history, account ledger, or otherwise asks Servicer to explain charges on an account, Servicer must promptly provide the requested history or ledger with a plain language description of the entries on the document. If a government entity requests a borrower's payment history, account ledger, or otherwise asks Servicer to explain charges on an account, pursuant to paragraph III.C.8 of this Agreement, then Servicer shall promptly provide the information described in this paragraph (V.A.3) to that entity.

B. Specific Fee Provisions.

1. Attorneys' Fees. Attorneys' fees charged in connection with a foreclosure action or bankruptcy proceeding shall only be for work actually performed and shall not exceed reasonable and customary fees for such work. In the event a foreclosure action is terminated prior to the final judgment and/or sale for a loss mitigation option, a reinstatement, or payment in full, the borrower shall be liable only for reasonable and customary fees for work actually performed.

2. Late Fees.

   a. Servicer shall not impose or collect any late fee or delinquency charge when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment, and the payment is otherwise a full payment for the applicable period and is paid on or before its due date or within any applicable grace period.

   b. Servicer shall not impose or collect late fees (i) based on an amount greater than the past due amount; (ii) collected from the escrow account or from escrow surplus without the approval of the borrower; or (iii) deducted from any regular payment.

   c. Servicer shall not impose or collect any late fees for periods during which (i) the borrower is making timely trial modification payments; or (ii) a short sale offer is being evaluated by Servicer. In addition, Servicer shall waive late fees for the period during which a loan modification application was pending, if a permanent modification is completed.

3. Payment Processing Fees.

a. Servicer shall not charge a borrower for submitting payments more frequently than required by the note or for submitting payments that exceed the current amount due.

b. Servicer shall not require a borrower to use any payment method (such as payment by phone) or any provider of payment processing services (payment provider) that would cause the borrower to incur a payment processing fee. This provision does not prohibit Servicer from requiring certified funds from borrowers in foreclosure.

c. Servicer shall not unreasonably restrict a borrower from using a particular payment method or payment provider.

d. If Servicer promotes, directs, or refers a borrower to a particular payment method or payment provider and the payment method or payment provider would cause the borrower to incur a payment processing fee, Servicer shall, prior to obtaining the approval of a borrower to use the particular payment method or provider, accurately, clearly, and prominently disclose:

i. That the borrower is not required to use the particular payment method or payment provider;

ii. That Servicer accepts other payment methods which the borrower can use without incurring a fee;

iii. That the borrower has the right to select the borrower's own payment method and provider; and

iv. The amount of the payment processing fee.

v. That Servicer has a business relationship with the payment provider and that Servicer may receive compensation or other financial benefit as a result of the borrower's use of the provider's services.

e. Servicer shall disclose and obtain approval from the borrower in accordance with paragraphs V.B.3.d-e, each time Servicer sets up or modifies a payment agreement. Servicer shall document in its records borrowers' approval each time Servicer sets up or modifies a payment agreement.

f. All requests to cancel an existing authorization for the use of a particular payment method or payment provider shall be honored upon the borrower's first written or oral request.

g. Servicer shall not use unfair or deceptive acts or practices to steer borrowers to a particular payment method or payment provider.

C. Third-Party Fees.

1. Servicer shall not impose unnecessary or duplicative property inspection, property preservation, or valuation fees on the borrower, including, but not limited to, the following:

   a. No property preservation fees shall be imposed on eligible borrowers who have a pending application with Servicer for loss mitigation relief or are performing under a loss mitigation program, unless Servicer documents a reasonable basis in its records or its vendor's records to believe that property preservation is necessary for the maintenance of the property, such as when the property is vacant or listed on a violation notice from a local jurisdiction;

   b. No property inspection fee shall be imposed on a borrower any more frequently than the time frames allowed under GSE or HUD guidelines unless Servicer has identified specific circumstances supporting the need for further property inspections and documented such circumstances in Servicer's records or its vendor's records; and

   c. Servicer shall be limited to imposing on a borrower property valuation fees (*e.g.*, BPO) once every 12 months, unless other valuations are requested by the borrower to facilitate a short sale or to support a loan modification as outlined in paragraph III.G.2, or required as part of the default or foreclosure valuation process. Pursuant to this paragraph (V.C.1.c), Servicer shall provide the borrower with a copy of any valuation requested by the borrower.

2. Default, foreclosure, and bankruptcy-related services performed by third parties shall be at reasonable market value.

3. Servicer shall be prohibited from collecting any unearned fee, or giving or accepting referral fees in relation to third-party default or foreclosure-related services.

4. Servicer shall not assess to a borrower its own mark-ups on Servicer-initiated third-party default or foreclosure-related services.

## VI. FORCE-PLACED INSURANCE.

A. Servicer shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance. For escrowed accounts, Servicer shall continue to advance payments for the homeowner's existing policy, unless the borrower or insurance company cancels the existing policy. For purposes of this Section (VI), the term "force-placed insurance" means hazard insurance coverage obtained by Servicer on behalf of the owner or assignee of a mortgage loan that insures the property securing the loan. However, for purposes of this Section (VI), the term "force-placed insurance" does not include hazard insurance required by the Flood Disaster Protection Act of 1973. The term "hazard insurance" means insurance on the property securing a mortgage loan that protects the property against loss caused by fire, wind, flood, earthquake, theft, falling objects, freezing, and other similar hazards for which the owner or assignee of such loan requires insurance.

B. Servicer shall not be construed as having a reasonable basis for obtaining force-placed insurance unless the requirements of this Section (VI) have been met.

C. Servicer shall accept any reasonable form of written confirmation from a borrower or the borrower's insurance agent of existing insurance coverage, which shall include the existing insurance policy number along with the identity of, and contact information for, the insurance company or agent.

D. All charges and coverage amounts related to force-placed insurance assessed to a borrower by or through Servicer must be bona fide and reasonable.

E. Servicer shall make reasonable efforts to work with the borrower to continue or reestablish the existing homeowner's policy if there is a lapse in payment and the borrower's payments are escrowed.

## VII. RESOLUTION OF ERRORS, COMPLAINTS, AND REQUESTS FOR INFORMATION.

A. General.

1. Unless otherwise specified, the provisions in this Section (VII) shall apply to written notices of errors, written complaints, and written requests for information to Servicer from a borrower, defined herein to include a borrower's authorized agent, that relate to the servicing of a borrower's loan ("Servicing Requests"). Servicing Requests from state Attorneys General, state financial regulators, the Executive Office of U.S. Trustee, each regional office of the U.S. Trustee, and federal regulators, including complaints forwarded by the Bureau or submitted through the Bureau's Web Portal, that relate to the servicing of a borrower's loan shall be treated in accordance with paragraph III.C.8 of this Agreement.

a. The provisions in this Section (VII) shall not apply to Servicing Requests that are untimely, overbroad, or duplicative.

i. A Servicing Request is untimely if it is delivered to Servicer more than one year after (1) servicing of the mortgage loan that is subject of the Servicing Request was transferred from Servicer to a transferee servicer; or (2) the mortgage loan is discharged.

ii. A Servicing Request is overbroad if Servicer cannot reasonably identify the borrower or if the borrower requests that the Servicer provide an unreasonable volume of documents or information to the borrower, or if Servicer cannot reasonably determine from the Servicing Request the information requested or the error or complaint asserted.

iii. A Servicing Request is duplicative if (1) it is substantially the same as a Servicing Request previously submitted by that borrower for which Servicer has previously complied with its obligations to respond; and (2) the borrower does not provide new and material information, data, or documentation that was not considered in any prior

investigation and that is reasonably likely to change the Servicer's prior response.

iv. If Servicer reasonably determines that a Servicing Request is overbroad or duplicative, Servicer shall notify the borrower in writing within five business days of making such determination. The notice to the borrower shall set forth the basis upon which Servicer has made such determination. Servicer shall maintain documentation supporting its determination in its records.

b. The provisions in this Section (VII) shall not apply to notices of error asserting that Servicer made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process in violation of 12 C.F.R. §§ 1024.41(f) or (j) or that Servicer moved for foreclosure judgment or order of sale or conducted a foreclosure sale in violation of 12 C.F.R. §§ 1024.41(g) or (j), if Servicer receives the notice of error seven or fewer days before a foreclosure sale. For any such notice of error, Servicer shall make a good faith attempt to respond to the borrower, orally or in writing, and either correct the error or state the reason Servicer has determined that no error has occurred.

2. Servicer shall maintain, and shall provide written notice to borrowers of, readily available methods for the submission of Servicing Requests. Servicer shall post the designated methods on any website maintained by Servicer if the website lists any contact address for Servicer.

3. If a borrower, defined herein to include a borrower's authorized agent, makes a verbal inquiry, notice of error, or complaint relating to the servicing of the borrower's loan:

a. If the representative to whom the Servicing Request is made is unable to receive and process the Servicing Request, that representative shall transfer the borrower to staff that is able to do so or escalate the Servicing Request for resolution;

b. Servicer shall request from the borrower, verbally and contemporaneously, any information reasonably necessary to timely and accurately investigate and respond to the Servicing Request;

c. Upon request, Servicer shall provide the name and operator identification of the representative to whom the borrower is currently speaking;

d. Upon request, the borrower shall immediately be transferred to a supervisor or, if a supervisor is not readily available, the borrower's call-back information shall be taken and a supervisor shall return the call within 24 hours; and

e. Servicer shall provide the borrower, verbally and contemporaneously, with the information described in Paragraph

VII.A.2 above if the borrower requests further assistance or investigation regarding his or her complaint in addition to the assistance or investigation that Servicer has offered to provide.

4. Servicer shall maintain a competent and adequate process for dispute escalation.

5. Servicer shall maintain competent and adequate staffing, systems, and policies, and shall conduct adequate reviews and audits, to ensure compliance with the provisions of this Section (VII).

B. Receipt and Acknowledgment.

1. Written notices of errors or complaints that relate to the servicing of a borrower's loan (together, "Servicing Disputes") that Servicer receives by mail, facsimile, e-mail, or otherwise to an address not designated for Servicing Disputes shall be forwarded to the department designated to receive Servicing Disputes within two business days. Servicer shall respond to such Servicing Disputes as though they had been sent to the designated address.

2. Within five business days of the department designated to receive Servicing Disputes receiving a Servicing Dispute, Servicer shall provide to the borrower a written response acknowledging receipt of the Servicing Dispute. The acknowledgment shall include:

a. A statement of the timeline, including any extension Servicer may seek, by which Servicer must provide the borrower with a written response resolving the Servicing Dispute; and

b. Contact information, including a toll-free telephone number, for further assistance.

C. Investigation and Response.

1. Upon receipt of a Servicing Dispute, Servicer shall cease collection calls until Servicer has investigated and responded to the Servicing Dispute. If Servicer has determined that no error has occurred, it may resume collection calls, including of amounts that accrued during the investigation period. Servicer may call a borrower as part of Servicer's effort to resolve the Servicing Dispute. The notice required by VII.B.2 shall notify borrowers that written correspondence, such as billing statements and mandatory state pre-foreclosure notices, may continue during the resolution of the Servicing Dispute.

2. Servicer shall not, for 60 days after receipt of a Servicing Dispute, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of the Servicing Dispute.

3. Servicer shall accurately investigate and respond to Servicing Disputes within 30 business days of receiving the Servicing Dispute. Investigation and response includes correction of any errors identified with the borrower's account, including errors discovered in the course of

investigation other than those alleged by the borrower, and remedial or other action necessary to resolve the Servicing Dispute. Servicer may extend the time period for responding to a Servicing Dispute by one additional period of 15 business days if, before the end of the 30 business day period, it notifies the borrower of the extension and the reasons for the extension in writing.

4. Servicer's investigation of a Servicing Dispute shall be based on a thorough review of the relevant documents and information in its possession, custody, or control or that are reasonably accessible to Servicer.

5. If Servicer determines as a result of its investigation of a Servicing Dispute that no error occurred based in whole or in part on a lack of documents or information, it shall notify the borrower of the information or documents that are missing and necessary to determine if an error occurred.

6. If Servicer concludes as a result of its investigation of a Servicing Dispute that an error occurred, it shall immediately correct all errors and restore the borrower's account to the position it would be in if Servicer had not made the error, including reversing and refunding any fees, charges, or other amounts incurred as a result of the error and correcting any subsequent payment misapplication or credit reporting arising from the error.

7. In response to a Servicing Dispute, Servicer shall provide the borrower with written notification of its resolution within the time period allowed. The notification shall include contact information, including a toll-free telephone number, for further assistance, and shall:

   a. Provide the information requested, unless the request is for duplicative, confidential, proprietary, privileged, or irrelevant information, or if the request is overbroad, unduly burdensome or untimely;

   b. State the reason for Servicer's determination;

   c. Notify the borrower of the corrections made, remedial actions taken, or other actions taken to resolve the Servicing Dispute, including the effective date of such corrections and/or actions; or

   d. State Servicer's basis for its resolution, including the findings that led Servicer to determine that there was insufficient basis to conclude that an error or improper act occurred, a statement of the borrower's right to request documents relied upon by Servicer in reaching its determination, and information regarding how the borrower can request such documents.

8. Upon request by a borrower who submitted a Servicing Dispute, Servicer shall provide, at no charge, copies of documents and information relied upon by Servicer in making its determination that no error occurred within 15 business days of receiving such request. Servicer is not required to provide documents that constitute confidential, proprietary, or privileged information. If Servicer withholds confidential, proprietary, or privileged

information, it shall notify the borrower of its determination in writing within 15 business days of receiving the borrower's request for such documents. In its response to a request for documentation, Servicer may omit location and contact information and personal financial information (other than information about the terms, status, and payment history of the mortgage loan) if: (i) the information pertains to a potential or Confirmed Successor in Interest who is not the requestor; or (ii) the requestor is a Confirmed Successor in Interest and the information pertains to any borrower who is not the requestor.

D. Documentation and Tracking.

1. Servicer shall document in its records the receipt of, investigation of, and response to Servicing Requests, including additional information received and communications regarding Servicing Requests.

2. Servicer shall maintain adequate systems and processes to track the status of Servicing Requests and, upon borrower request, provide accurate and timely information regarding the borrower's Servicing Request.

3. Servicer shall maintain documentation of the receipt of, investigation of, and response to Servicing Requests.

4. Unless otherwise prohibited by law, Servicer shall record and maintain all inbound and outbound calls to and from borrowers and Servicer employees whose primary responsibilities are customer-facing, and shall maintain such recordings and call information in a manner allowing for retrieval and production of such information and recordings.

## VIII. PRIVATE MORTGAGE INSURANCE

A. Definitions. In this section the following definitions shall apply:

1. The term "cancellation date" means:

a. with respect to a fixed rate mortgage, at the option of the mortgagor, the date on which the principal balance of the mortgage:

i. based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 80 percent of the original value of the property securing the loan; or

ii. based solely on actual payments, reaches 80 percent of the original value of the property securing the loan;

b. with respect to an adjustable rate mortgage, at the option of the mortgagor, the date on which the principal balance of the mortgage:

i. based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 80

percent of the original value of the property securing the loan; or

ii. based solely on actual payments, first reaches 80 percent of the original value of the property securing the loan.

2. The term “termination date” means:

a. with respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

b. with respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

B. Termination of Private Mortgage Insurance

1. Borrower Cancellation

a. A requirement for private mortgage insurance in connection with a residential mortgage transaction shall be canceled on the cancellation date or any later date that the mortgagor fulfills all of the requirements under paragraphs (i) through (iv), if the mortgagor:

i. submits a request in writing to the servicer that cancellation be initiated;

ii. has a good payment history with respect to the residential mortgage;

iii. is current on the payments required by the terms of the residential mortgage transaction; and

iv. has satisfied any requirement of the holder of the mortgage (as of the date of a request under paragraph (i)) for:

a. evidence (of a type established in advance and made known to the mortgagor by the servicer promptly upon receipt of a request under paragraph (i)) that the value of the property securing the mortgage has not declined below the original value of the property; and

b. certification that the equity of the mortgagor in the residence securing the mortgage is unencumbered by a subordinate lien.

2. Automatic Termination

a. A requirement for private mortgage insurance in connection with a residential mortgage transaction shall terminate with respect to payments for that mortgage insurance made by the mortgagor:

i. on the termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction; or

ii. if the mortgagor is not current on the termination date, on the first day of the first month beginning after the date that the mortgagor becomes current on the payments required by the terms of the residential mortgage transaction.

3. Final Termination

a. If a requirement for private mortgage insurance is not otherwise canceled or terminated in accordance with subsection VIII(B)(1) or (2) of this section, in no case may such a requirement be imposed on residential mortgage transactions beyond the first day of the month immediately following the date that is the midpoint of the amortization period of the loan if the mortgagor is current on the payments required by the terms of the mortgage.

4. Refund of Unearned Premiums

a. Not later than 45 days after the termination or cancellation of a private mortgage insurance requirement under this section, all unearned premiums for private mortgage insurance shall be returned to the mortgagor by the servicer.

## IX. General Servicer Duties and Prohibitions.

A. Measures to Deter Community Blight.

1. Servicer shall develop and implement policies and procedures to ensure that REO properties do not become blighted.

2. As indicated in paragraph I.A.8, Servicer shall (a) inform borrower that if the borrower continues to occupy the property, he or she has responsibility to maintain the property, and an obligation to continue to pay taxes owed, until a sale or other title transfer action occurs; and (b) request that if the borrower does not wish to continue to occupy the property, he or she contact Servicer to discuss alternatives to foreclosure under which borrower can surrender the property to Servicer in exchange for compensation.

3. When Servicer makes a determination to not pursue a foreclosure action on a property, Servicer shall send the borrower a final billing statement, notifying the borrower of Servicer's decision to not pursue foreclosure and informing the borrower about the borrower's right to occupy the property until a sale or other title transfer action occurs.

B. Borrowers with Limited English Proficiency ("LEP").

1. Servicer shall develop, maintain, and implement policies and procedures related to borrowers with LEP. Servicer shall ensure that its services provided to LEP borrowers are consistent with its policies and procedures.

2. Servicer shall capture and track in its records LEP borrowers' preferences for certain languages other than English.

3. Servicer shall provide verbal translation services which shall be available to assist LEP borrowers on an as-needed basis.

4. When evaluating borrowers for loss mitigation options, Servicer shall accept state and federal government forms that are in Spanish. Servicer shall make reasonable efforts to review any other loss mitigation application materials submitted in Spanish. Except for borrowers whose loss mitigation application submissions are deemed complete by Servicer, Servicer shall contact borrowers who submit loss mitigation applications in languages other than English by phone, in the language used by the borrower in the submitted materials, to notify them of the loss mitigation process, including the documents required by Servicer for a complete application, and inform them if they are required to resubmit those materials in English in order to qualify for loss mitigation.

5. Servicer shall require third-party agents who regularly interact with borrowers to be trained on the availability of Servicer's verbal translation services for LEP borrowers and regulatory requirements imposed by federal consumer financial laws.

C. Whistleblower Provision. Servicer shall maintain policies and procedures encouraging all employees at any level to report, without repercussion or retaliation, to senior to management level employees independent from the servicing operation any actual or potential deficiencies or issues that arise with regard to Servicer's mortgage servicing operations, duties, and responsibilities, including those arising under this Agreement. Such policies and procedures shall include the maintenance of a toll-free hotline and allow for anonymous reporting.

## X. GENERAL PROVISIONS, DEFINITIONS, AND IMPLEMENTATION.

A. Applicable Requirements.

1. The servicing standards set forth in this Agreement and any modifications or other actions taken in accordance with these servicing standards are expressly subject to, and shall be interpreted in accordance with, (a) applicable federal, state, and local laws, rules, and regulations, including, but not limited to, any requirements of the state and federal banking regulators, (b) the terms of the applicable mortgage loan documents, (c) Section 201 of the Helping Families Save Their Homes Act of 2009, (d) the terms and provisions of the Servicer Participation Agreement with the Department of Treasury, (e) any servicing agreement, subservicing agreement under which Servicer services for others, special servicing agreement, mortgage or bond insurance policy or related agreement or requirements to which Servicer is a party and by which it or its servicing is

bound pertaining to the servicing or ownership of the mortgage loans, including without limitation the requirements, binding directions, or investor guidelines of the applicable investor (such as Fannie Mae or Freddie Mac), mortgage or bond insurer, or credit enhancer, and (f) no-contact or cease-and-desist requests made by borrowers (collectively, the "Applicable Requirements").

2. In the event of a conflict between the requirements of this Agreement and the Applicable Requirements with respect to any provision of this Agreement such that Servicer cannot comply without violating Applicable Requirements or being subject to adverse action, including fines and penalties, Servicer shall document the categories of such conflicts and notify the Executive Committee that it intends to comply with the Applicable Requirements to the extent necessary to eliminate the conflict. If the Executive Committee objects to Servicer's assertion of the Applicable Requirements provision, the parties shall have a meet and confer within 20 days to discuss the dispute.

3. Unless otherwise specified, Servicer shall maintain all of the records, reports, data, and documentation referenced in this Agreement for the duration of this Agreement. Servicer shall maintain all of the call recordings referenced in Section VII.D.4 for a period of one year from the date of recording.

B. Applicable Dates for Written Communications Required by this Agreement.

1. Servicer shall date all written communication to borrowers, occupants, Successors in Interest, and potential Successors in Interest, and Servicer shall promptly mail all written communication to the recipient. For electronic communications, Servicer shall maintain metadata indicating the date of the communication.

2. Servicer shall ensure that its third party vendors mail all written communications to borrowers, occupants, Successors in Interest, and potential Successors in Interest in accordance with its third party vendor contracts.

3. Servicer shall maintain records of mailing of all written communications in a form and manner that is accessible to the Executive Committee.

C. Duty to Notify.

1. Unless prohibited by law, Servicer shall notify the Executive Committee in writing within 15 days of the initiation of any official action against Servicer by the Attorney General of any state related to residential mortgage servicing, including but not limited to the issuance of a subpoena or a civil investigatory demand in an investigation relating to Servicer, or within 15 days of settlement agreement or other form of consensual resolution, or entry of judgment in any administrative, civil, or criminal investigation or action by any state or federal authority against Servicer, provided that such violation of law, investigation, or action pertains to Servicer's residential mortgage servicing. Notwithstanding the foregoing and for avoidance of

doubt, Servicer's receipt of a subpoena or civil investigative demand from a state or federal authority does not constitute a formal regulatory action.

2. Servicer shall provide such additional information as may be requested by the Executive Committee, including, but not limited to, copies of correspondence pertaining to the investigation, on-going updates, and copies of any resulting pleadings, judgments, or orders, that are not privileged or subject to a confidentiality agreement.

D. Definitions.

1. In each instance in this Agreement in which Servicer is required to ensure adherence to, or undertake to perform certain obligations, it is intended to mean that Servicer shall (a) authorize and adopt such actions on behalf of Servicer as may be necessary for Servicer to perform such obligations and undertakings; (b) follow up on any material non-compliance with such actions in a timely and appropriate manner; (c) require corrective action be taken in a timely manner of any material non-compliance with such obligations; and (d) take appropriate remedial steps if deficiencies are identified, including appropriate remediation in individual cases.

2. References to Servicer shall mean Nationstar Mortgage LLC and shall include Servicer's successors and assignees in the event of a sale of all or substantially all of the assets of Servicer or of Servicer's division(s) or major business unit(s) that are engaged as a primary business in customer-facing servicing of residential forward mortgages on owner-occupied properties. For purposes of Section II, Servicer also includes Xome Holdings LLC. The provisions of this Agreement shall not apply to those divisions or major business units of Servicer that are not engaged as a primary business in customer-facing servicing of residential forward mortgages on owner-occupied one-to-four family properties on its own behalf or on behalf of investors.

# EXHIBIT B

**DISTRIBUTION OF BORROWER PAYMENT AMOUNT**

1. The Borrower Payment Amount shall be administered under the direction and control of the Executive Committee in the following manner.

2. The Executive Committee chooses Rust Consulting, Inc. as the Settlement Administrator (the "Settlement Administrator") to administer the distribution of payments to individual borrowers under this Consent Judgment. All costs and expenses of the Settlement Administrator, including taxes, shall be paid from the Borrower Payment Amount.

3. Defendant shall provide to the Settlement Administrator all information in its possession, custody, or control that is reasonably necessary for the administration of the Borrower Payment Amount. Nationstar shall provide the information within a reasonable time after receipt of the request for information after the Consent Judgment has been entered. Defendant is ordered herein to provide such information under 15 U.S.C. § 6802(e)(1)(A), (5) and (8) of the Gramm-Leach-Bliley Act. Defendant shall warrant to the Plaintiff States of the Executive Committee at the time of supplying information to the Settlement Administrator that the information is complete and accurate to the best of its knowledge and capability. Defendant's duty to supply complete and accurate information, to the best of its knowledge and capability, regarding borrowers eligible for the Borrower Payment Amount shall continue throughout the administration process.

4. The Settlement Administrator may provide information to a Plaintiff State pertaining to individual eligible borrowers who are or were residents of such state, including names and other identifying information, only if the information is used by the

Plaintiff State or its authorized representatives solely for the purpose of contacting eligible borrowers, responding to inquiries from borrowers regarding their eligibility or concerning the distribution of borrower payments under this Consent Judgment, and/or complying with tax reporting and withholding obligations, if any.

5. After the completion of the distribution of the Borrower Payment Amount, the Settlement Administrator shall provide a final report to Defendant, upon Defendant's request, identifying which borrowers have received payment. In addition, Defendant may request from the Settlement Administrator interim reports as may be deemed reasonable by the Executive Committee, and such agreement, consent, or approval shall not be unreasonably withheld. Interim reports necessary to ensure that Borrowers will not receive duplicate payments, by virtue of litigation or otherwise, are deemed reasonable.

6. As a condition to receipt of any payment from the Borrower Payment Amount, each borrower must agree that such payments shall offset and operate to reduce any other obligation Defendant or Defendant's affiliates or subsidiaries have to the borrower to provide compensation or other payment for the same issue or injury. However, borrowers shall not be required to release or waive any other right or legal claim as a condition of receiving such payments.

7. No later than 10 days after the date on which the Order is entered by the Court, consistent with this Consent Judgment, Exhibit B, and instructions provided by the Executive Committee, the Defendant shall deposit $6,434,100 (the "Borrower Payment Amount") of the Direct Payment Amount by electronic funds transfer into the Qualified Settlement Fund Distribution Account. The Borrower Payment Amount and any other funds provided to the Settlement Administrator for these purposes shall be administered

in accordance with the terms set forth in this Consent Judgment and Exhibit B. The Borrower Payment Amount shall be used: (1) for payments to borrowers who submit claims and are in either or both of the Service Transfer and Property Preservation Populations set forth below; and (2) for reasonable costs and expenses of the Settlement Administrator, including taxes and fees for tax counsel. The Populations eligible to receive payments are defined as follows:

a. *Service Transfer Population.* The Service Transfer Population shall mean borrowers whose loans (i) were transferred in bulk to Nationstar for servicing between and including February 1, 2011 and December 18, 2017, and (ii) which became 30 days delinquent within 90 days of the service transfer and (iii) which delinquency subsequently resulted in dispossession of the property in foreclosure, and (iv) which otherwise meet any additional criteria set by the Executive Committee; or

b. *Property Preservation Population.* The Property Preservation Population shall mean borrowers whose property was (i) subject to a property inspection by Nationstar or its agent, and (ii) was determined to be vacant, and (iii) as a result of that determination Nationstar or its agent changed the lock on the property between and including June 24, 2011 and December 29, 2017, and (iv) either within 30 days of the initial lock change the borrower requested access to the property, or within 90 days of the initial lock change the property was reported as occupied through a subsequent inspection, and (v) which otherwise meet any additional criteria set by the Executive Committee.

8. Any payment to individual borrowers awarded under the terms of this Consent Judgment is not and shall not be considered as forgiven debt.

9. For borrowers who lost their home to foreclosure in the Service Transfer Population, the purposes of the payments described in this Consent Judgment and Exhibit B are remedial and relate to the reduction in the proceeds deemed realized by borrowers for tax purposes from the foreclosure sale of residential properties owned by the borrowers allegedly resulting from the allegedly unlawful conduct of the Defendant.

10. For borrowers in the Property Preservation Population, the purposes of the payments described in this Consent Judgment and Exhibit B are intended to reimburse borrowers for expenses incurred as a result of being locked out of their homes.

11. Any amounts made available hereunder remain a part of the Qualified Settlement Fund until distributed to borrowers and shall be administered in accordance with the terms set forth in this Exhibit B.

12. After exhausting all reasonable efforts to pay eligible borrowers, any remaining Borrower Payment Amount held in the Qualified Settlement Fund may be used, at the discretion of the Executive Committee, to pay the costs and expenses of administration (including taxes) or for any other housing-related purpose.

13. The Settlement Administrator is responsible for ensuring that any uncashed checks issued to borrowers from the Borrower Payment Amount and that have passed their stale date shall be escheated to the state of the borrower's last known address, so that such borrower, or such borrower's rightful heirs, will maintain their ability to claim such payment pursuant to that state's processes for collecting unclaimed funds.

# EXHIBIT C

**RELEASE**

**I. Covered Conduct**

For the purposes of this Release, the term “Covered Conduct” means residential mortgage loan servicing and residential mortgage foreclosure services, each as defined below. The “Released Parties” shall include Nationstar Mortgage LLC (“Defendant” or “Nationstar”), doing business as Mr. Cooper, including Nationstar’s current and former parent corporations or other forms of legal entities (including Nationstar Mortgage Holdings, LLC and Mr. Cooper Group, Inc.), direct and indirect subsidiaries, brother or sister corporations or other forms of legal entities, divisions or affiliates, and the predecessors, successors, and assigns of any of them, as well as the current and former directors, officers, and employees of any of the foregoing.

The Released Parties are released from liability for Covered Conduct due to acts, errors, or omissions of their agents or representatives (including, without limitation, third party vendors). This Release does not release the agents or representatives (including, without limitation, third-party vendors) themselves for any of their acts, errors, or omissions.

For the purposes of this Release, the term “residential mortgage loans” means forward loans secured by one- to four- family residential properties, irrespective of usage, whether in the form of a mortgage, deed of trust, or other security interest creating a lien upon such property or any other property described therein that secures the related mortgage note.

For the purposes of this Release, the term “residential mortgage loan servicing” means all actions, errors or omissions of the Released Parties, arising out of or relating to servicing (including subservicing and master servicing) of residential mortgage loans from and after the

closing of such loans, whether for the Released Parties' account or for the account of others, including, but not limited to, the following: (1) Loan modification, including increases in monthly payments as trial modifications became permanent, and other loss mitigation activities, including, without limitation, extensions, forbearances, payment plans, short sales and deeds in lieu of foreclosure, and evaluation, approval, denial, and implementation of the terms and conditions of any of the foregoing; (2) Communications with borrowers relating to borrower accounts, including, without limitation, account statements and disclosures provided to borrowers; (3) Handling and resolution of inquiries, disputes or complaints by or on behalf of borrowers; (4) Collection activity related to delinquent borrower accounts; (5) Acceptance, rejection, application or posting of payments made by or on behalf of borrowers, including, without limitation, assessment and collection of fees or charges, placement of payments in suspense accounts and credit reporting; (6) Maintenance, placement or payment (or failure to make payment) of any type of insurance or insurance premiums, or claims activity with respect to any such insurance, and maintenance and cancellation of (or failures or delays in cancelling) private mortgage insurance; (7) Payment of taxes, homeowner association dues, or other borrower obligations, and creation and maintenance of any escrow accounts; (8) Use, conduct or supervision of vendors, agents and contract employees, whether affiliated or unaffiliated, including, without limitation, sub-servicers and foreclosure and bankruptcy attorneys, in connection with servicing, loss mitigation, and foreclosure activities; (9) Adequacy of staffing, training, systems, data integrity or security of data that is related to the servicing of residential mortgage loans, foreclosure, bankruptcy, and property sale and management services; (10) Securing, inspecting, repairing, maintaining, or preserving properties before and after foreclosure

or acquisition or transfer of title, including management of property inspection vendors; (11) Servicing of residential mortgage loans involved in bankruptcy proceedings, including calculation and collection of escrow during bankruptcy and subsequent collection after bankruptcy; (12) Obtaining, executing, notarizing, endorsing, recording, providing, maintaining, registering (including in a registry system), and transferring promissory notes, mortgages, or mortgage assignments or other similar documents, or transferring interests in such documents among and between servicers and owners, and custodial functions or appointment of officers relating to such documents; (13) Decisions on disposition of residential mortgage loans, including, without limitation, whether to pursue foreclosure on properties, whether to assert or abandon liens and other claims and actions taken in respect thereof, and whether to pursue any particular loan modification or other form of loss mitigation; (14) Servicing of residential mortgage loans of borrowers who are covered by federal or state protections due to military status; (15) Quality control, quality assurance, compliance, audit, testing, and risk assessment, related to residential mortgage loan servicing; (16) Trustee functions related to the servicing of residential mortgage loans; (17) Management of loans on which servicing rights or obligations were transferred, including boarding, information capture, quality control, continuity, accuracy, and identification and proper servicing of loan modifications and in-flight modification applications; and (18) Acts and practices that are alleged to be unlawful in the Complaint.

The term “residential mortgage foreclosure services” means all actions, errors or omissions of the Released Parties arising out of or relating to defaults, default management, , or foreclosures of residential mortgage loans, whether for the Released Parties’ own account or for the account of others, including, but not limited to, the following: (1) Evaluation of accounts for

modification or foreclosure referral; (2) Maintenance, assignment, recovery and preparation of documents that have been filed or otherwise used to initiate or pursue foreclosures, and custodial actions related thereto; (3) Drafting, review, execution and notarization of documents (including, but not limited to, affidavits, notices, certificates, substitutions of trustees, and assignments) prepared or filed in connection with foreclosures or sales of acquired properties, or in connection with remediation of improperly filed documents; (4) Commencement, advancement and finality of foreclosures, including, without limitation, any issues relating to standing, fees, or notices; (5) Acquisition of title post-foreclosure or in lieu of foreclosure; (6) Pursuit of pre- and post-foreclosure claims by the Released Parties, including, without limitation, the seeking of deficiency judgments when permitted by law, acts or omissions regarding lien releases, and evictions and eviction proceedings; (7) Management, maintenance, and disposition of properties in default or properties owned or controlled by the Released Parties, whether prior to or during the foreclosure process or after foreclosure, and executing, notarizing, or recording any documents related to the sale of acquired properties; (8) Quality control, quality assurance, compliance, audit, testing, and risk assessment related to residential mortgage foreclosure services; (9) Trustee functions related to the foreclosure of residential mortgage loans; and (10) Management of accounts in default, up through and including foreclosure and post-foreclosure, including the commencement, continuation and completion of the foreclosure process while loan modification, deferral, forbearance, loan workout, deed-in-lieu, short sale or other alternative disposition was required, requested or under consideration and including wrongful foreclosure whether due to error, negligence, or other act or omission.

## II. Release of Covered Conduct

By their execution of this Consent Judgment, the Attorneys General that are parties to this Consent Judgment release and forever discharge the Released Parties from the following: any civil or administrative claim, of any kind whatsoever, direct or indirect, that an Attorney General has or may have or assert, including, without limitation, claims for damages, fines, injunctive relief, remedies, sanctions, or penalties of any kind whatsoever based on, arising out of, or resulting from the Covered Conduct occurring between January 1, 2011, and December 31, 2017, as well as the findings in the Servicing Report of Examination issued on May 6, 2015 to Nationstar by the Multi-State Mortgage Committee, except for claims and the other actions set forth in Section III below.

This Release does not release any claims against any entity other than the Released Parties as defined in Section I above.

**III. Claims and Other Actions Exempted from Release**

Notwithstanding the foregoing and any other term of this Consent Judgment, the following claims are hereby not released and are specifically reserved:

1. Claims for any and all acts or practices occurring on or after January 1, 2018.

2. Securities and securitization claims based on the offer, sale, or purchase of securities, or other conduct in connection with investors or purchasers in or of securities, regardless of the factual basis of the claim, including such claims of the state or state entities as an owner, purchaser, or holder of whole loans, securities, derivatives or similar investments, including, without limitation, mortgage backed securities, collateralized debt obligations, or structured investment vehicles, and including, but not limited to, such claims based on the following:

a. the creation, formation, solicitation, marketing, assignment, transfer, offer, sale or substitution of securities, derivatives, or other similar investments, including, without limitation, mortgage backed securities, collateralized debt obligations, collateralized loan obligations, or structured investment vehicles;

b. representations, warranties, certifications, or claims made regarding such securities or investments, such as representations, warranties, certifications or claims regarding origination, funding, and underwriting activities, and including the eligibility, characteristics, or quality of the mortgages or the mortgagors;

c. the transfer, sale, conveyance, or assignment of mortgage loans to, and the purchase and acquisition of such mortgage loans by, the entity creating, forming and issuing the securities, derivatives or other similar investments relating to such mortgage loans;

d. all servicing-, foreclosure-, and origination-related conduct, but solely to the extent that such claims are based on the offer, sale, or purchase of securities, or other conduct in connection with investors or purchasers in or of securities; and

e. all Covered Conduct, but solely to the extent that such claims are based on the offer, sale, or purchase of securities, or other conduct in connection with investors or purchasers in or of securities.

For avoidance of doubt, securities and securitization claims based on the offer, sale, or purchase of securities, or other conduct occurring in connection with investors or purchasers in or of securities, that are based on any source of law, including, but not limited to, false claims acts or equivalent laws, securities laws, and common law breach of fiduciary duty, are not released.

3. Claims against a trustee or custodian or an agent thereof based on or arising out of the conduct of the trustee, custodian or such agent related to the pooling of residential mortgage loans in trusts, mortgage backed securities, collateralized debt obligations, collateralized loan obligations, or structured investment vehicles, including, but not limited to, the performance of trustee or custodial functions in such conduct.

4. Liability based on Nationstar's obligations created by this Consent Judgment.

5. Claims arising out of alleged violations of fair lending laws that relate to discriminatory conduct in lending.

6. Claims of state, county and local pension or other governmental funds as investors (whether those claims would be brought directly by those pension or other governmental funds or by the Office of the Attorney General as attorneys representing the pension or other governmental funds).

7. Tax claims, including, but not limited to, claims relating to real estate transfer taxes.

8. Claims of county and local governments and claims or disciplinary proceedings of state regulatory agencies having specific regulatory jurisdiction that is separate and independent from the regulatory and enforcement jurisdiction of the Attorney General.

9. Claims of county recorders, city recorders, town recorders or other local government officers or agencies (or, for Hawaii only, where a statewide recording system is applicable and operated by the state, claims by Hawaii; and for Maryland, where the recording system is the joint responsibility of the counties or Baltimore City and the state, claims of the counties or Baltimore City and the state), for fees relating to the recordation or registration

process of mortgages or deeds of trust, including assignments, transfers, and conveyances, regardless of whether those claims would be brought directly by such local government officers or agencies or through the Office of the Attorney General as attorneys representing such local government officers or agencies.

10. Claims and defenses asserted by third parties, including individual mortgage loan borrowers on an individual or class basis.

11. Claims seeking injunctive or declaratory relief to clear a cloud on title where the Covered Conduct has resulted in a cloud on title to real property under state law; provided, however, that the Attorneys General shall not otherwise take actions seeking to invalidate past mortgage assignments or foreclosures in connection with loans serviced and/or owned by the Released Parties. For the avoidance of doubt, nothing in this paragraph 11 releases, waives or bars any legal or factual argument related to the validity of past mortgage assignments or foreclosures that could be made in support of claims not released herein, including, without limitation, all claims preserved under Section III of this Release.

12. Authority to resolve consumer complaints brought to the attention of Nationstar by a state Attorney General.

13. Claims for violation of state or federal law relating to residential mortgage loan origination.

14. Claims related to reverse mortgages.

# EXHIBIT D

**DISTRIBUTION OF ATTORNEY'S FEES AND COSTS**

1. In accordance with Paragraph 10 of the Consent Judgment, Defendant shall deposit a collective total of $3,860,900 (the Attorney's Fees and Costs portion of the Direct Payment Amount) into the Qualified Settlement Fund Distribution Account. The Settlement Administrator shall allocate the Attorney's Fees and Costs from the Qualified Settlement Fund Distribution Account to each Investigating Attorney General as follows:

   a. Illinois and Iowa – $455,450 to each;
   b. Florida and Texas – $350,000 to each; and
   c. Arizona, California, Colorado, Connecticut, Nevada, North Carolina, Ohio, Oregon, and Washington – $250,000 to each.

2. The Settlement Administrator shall distribute payments within fifteen (15) days after receipt of written payment processing instructions from an individual Investigating Attorney General.

3. The distributions of Attorney's Fees and Costs to each Investigating Attorney General shall be in accordance with the information in the Paragraphs below:

**ARIZONA**

Pursuant to A.R.S. § 44-1534, Defendant is jointly and severally liable and obligated to pay to the Attorney General the amount of $250,000.00 in attorneys' fees and costs due at the time of entry of this Consent Judgment, to be deposited into the Consumer Protection-Consumer Fraud Revolving Fund pursuant to A.R.S. § 44-1531.01, and used for the purposes set forth therein.

**CALIFORNIA**

Payment to California shall be made to the California Attorney General. The payment shall be allocated and used in accordance with Business and Professions Code section 17206.

**COLORADO**

All payments are to be held, along with any interest thereon, in trust by the Colorado Attorney General to be used in the Colorado Attorney General's sole discretion for reimbursement of the State of Colorado's actual costs and attorneys' fees, the payment of restitution, if any, and for future consumer fraud or antitrust enforcement, consumer education, or public welfare purposes.

## CONNECTICUT

Pursuant to Section IV, Paragraph 10 of the Consent Judgment, payment to Connecticut of $250,000 for attorneys' fees shall be made by wire transfer pursuant to instructions to be provided by the Connecticut Office of the Attorney General. Such payment for attorneys' fees shall be deposited into the Consumer Protection Fund of the Office of the Attorney General to support the Attorney General's consumer protection work, including but not limited to consumer complaint resolution, consumer education programs, and consumer protection enforcement.

## FLORIDA

Pursuant to Section IV, Paragraph 10 of the Consent Judgment, the $350,000 payment to Florida for attorneys' fees shall be made by wire transfer, a cashier's check, or other certified funds, made payable to the Department of Legal Affairs Revolving Trust Fund. The payment shall be deposited in the Department of Legal Affairs Revolving Trust Fund, in accordance with Section 501.2101(1), Florida Statutes.

## ILLINOIS

The Settlement Administrator shall distribute $455,450 to the Attorney General of Illinois pursuant to instructions provided by the Illinois Attorney General's Office. These funds shall be deposited into the Attorney General Court Ordered and Voluntary Compliance Payment Projects Fund for subsequent expenditure as authorized by the Attorney General. Nationstar is not entitled to any further accounting regarding the money deposited into the Attorney General Court Ordered and Voluntary Compliance Payment Projects Fund.

## IOWA

The Settlement Administrator shall pay $455,450 to the Attorney General of Iowa by electronic funds transfer according to instructions received from the Attorney General of Iowa. The payment shall be used at the sole discretion of the Attorney General of Iowa for any use permitted by law and this Consent Judgment, including but not limited to: public education and litigation relating to consumer fraud, mortgage, housing, and financial issues, including enforcement of Iowa Code section 714.16, or for any other lawful purpose.

## NEVADA

Pursuant to Section IV, Paragraph 10 of the Consent Judgment, the Nevada Attorney General shall receive a payment of Two Hundred, Fifty Thousand dollars ($250,000) via wire transfer. These funds shall be used at the sole discretion of the Nevada Attorney General for any use permitted by state law, including but not limited to attorneys' fees and other costs, consumer protection purposes, or for any other lawful purpose.

**NORTH CAROLINA**

Pursuant to Section IV, Paragraph 10 of the Consent Judgment, North Carolina's payment of $250,000 shall be used for attorneys' fees and other costs, consumer protection purposes, and other purposes allowed by law, in the discretion of the North Carolina Attorney General.

**OHIO**

Pursuant to Section IV, Paragraph 10 of the Consent Judgment, Ohio's payment of $250,000 shall be distributed and delivered to the office of the Ohio Attorney General. The money received by the office of the Ohio Attorney General pursuant to this paragraph may be used by the office of the Ohio Attorney General for purposes that may include, but are not limited to, attorney's fees and other costs of investigation and litigation, or may be placed in, or applied to, any consumer protection law enforcement fund, including consumer protection or privacy enforcement, consumer education, litigation or local consumer aid fund, or for such other uses permitted by Ohio law, at the sole discretion of the Ohio Attorney General.

**OREGON**

Pursuant to Section IV, Paragraph 10 of the Consent Judgment, the $250,000 payment to the Oregon Attorney General shall be made by wire transfer to the Oregon Department of Justice Account established pursuant to ORS 180.095 to be used as provided by law.

**TEXAS**

Pursuant to Section IV, Paragraph 10 of the Consent Judgment, Texas's payment of $350,000 for reimbursement of attorney's fees shall be paid to the Texas Attorney General. Payment instructions will be supplied to Defendant by the Texas Attorney General.

**WASHINGTON**

Pursuant to Paragraph 10 of the Consent Judgment, Washington's payment of $250,000 shall be used for costs and reasonable attorney's fees incurred by Washington in pursuing this matter and for potential enforcement of this Consent Judgment, for future enforcement of RCW 19.86, or for any lawful purpose in the discharge of the Attorney General's duties, at the sole discretion of the Attorney General.